UNITED STATES of America,
Plaintiff–Appellee,

v.

Gregory Lee MARTIN, Sr.,
Defendant–Appellant.

No. 94–3342.

United States Court of Appeals,
Seventh Circuit.

Argued June 5, 1995.

Decided Aug. 14, 1995.

Joel Merkel, Asst. U.S. Atty. (argued), Gerard B. Schneller, Criminal Div., Fairview Heights, IL, for U.S.

Edward X. Clinton, Sr. (argued), Chicago, IL, for Gregory Lee Martin, Sr.

Before POSNER, Chief Judge, FLAUM and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

Defendant Gregory Lee Martin, Sr. was convicted of arson involving a building used in interstate commerce, in violation of 18 U.S.C. § 844(i), and sentenced to fifty years imprisonment. Martin disputes federal jurisdiction over the arson charge, several evidentiary rulings, a jury instruction, and his sentence. We affirm his conviction but vacate his sentence and remand for resentencing.

I.

In the early morning of October 24, 1992, fire destroyed a two-story apartment building at 1414 Highland Avenue in Alton, Illinois. No one lived in the building at the time of the fire, although the building's last tenant, Mattie Alvioon, who had ceased paying rent in August, still had personal property there. As fire fighters fought the blaze, the south wall of the building collapsed. Three fire fighters were trapped under the fallen wall; two of them died.

Officers from the Alton Police Department began investigating the fire that same morning. At about 4:00 a.m., almost one hour after the fire fighters had been dispatched to the scene, Officer Anthony Ventimiglia interviewed the owner of the building, defendant Gregory Martin. Martin told Ventimiglia that he thought the fire might be an act of retaliation in response to his having informed on drug dealers in the area. He also mentioned a Mr. Smith whom he had evicted

from the premises and who might harbor a grudge.

Later that same day, police officers took Martin to the Alton police department and introduced him Agent Tom Lane from the Bureau of Alcohol, Tobacco and Firearms. Although Martin and Lane dispute what happened, Martin apparently agreed to make some sort of statement or sign some sort of waiver and then changed his mind and decided to do nothing until he had consulted with an attorney. In any event, Martin left the police station without having said or done anything.

On October 28, 1992, Alton police officers interviewed Delanney Gordon. Gordon lived across the street from the burned residence in an apartment also owned by Martin and had done some repair work for Martin. After being advised of his rights, Gordon admitted having set the October 24 fire for Martin, saying he was confessing because he felt guilty about the deaths of the fire fighters. Gordon maintained that Martin had offered him a reduction in his rent if he would destroy the building. Gordon asserted that Martin instructed him to light a candle in a hamper in the basement of the 1414 Highland building and that he did so at about 2:00 a.m. on the morning of the fire. Gordon also indicated that he noticed a strange and irritating odor as he lit the candle. Police videotaped the entire confession.

After confessing, Gordon permitted the police to search his apartment. Gordon also agreed to wear a tape recorder and transmitter and speak to Martin. On the evening of October 28, Gordon went to Martin's home and asked him for money to leave town; Gordon told Martin that the police had interviewed him and he needed to flee. Gordon also expressed remorse over the dead fire fighters. Martin replied that Gordon did not have to worry because Martin wanted to confess everything and do so quickly and without a fight. Although the tape of this conversation later proved inaudible, at least

five law enforcement officers heard the transmitted conversation.

Within minutes after Gordon left, Martin called the Alton Police Department and asked to speak to a detective working on the Highland building arson. The dispatcher who answered the call did not connect Martin with anyone but did take Martin's name and address. Detective Hayes arrived at Martin's home shortly thereafter and arrested Martin. Hayes then turned Martin over to a uniformed officer who had arrived at Martin's home shortly after Hayes. The officer transported Martin to the police station.

At the station, Martin made a number of incriminating statements to several police officers. First, according to Hayes, Martin stated during processing that he wanted to make a full confession but wanted to have a newspaper reporter present. Hayes responded that he could not talk to Martin for legal reasons, whereupon Martin said that he wanted his attorney too so that he could make a full confession with him present in order to "make a deal." Hayes told Martin that there would be no deals. Ventimiglia also was present during this conversation. Second, while Officer Daniel Geil fingerprinted Martin, Martin told him that "I hurt a lot of people with this fire, I know I did. I have a lot of respect for firemen. I even wanted to be a fireman at one time." Finally, Martin made incriminating statements to Officer James Hessel, whom Martin knew and whom he chanced upon at the station. Martin told Hessel that he had "messed up" and admitted being tied to the Highland Avenue fire, although he denied actually setting it.[1]

While in jail prior to trial, Martin again allegedly confessed to Brad Flowers, who resided in the adjoining cell while awaiting his own trial on weapons charges. Flowers testified that Martin told him he was having money problems and had the Highland Avenue building burned because of them. According to Flowers, Martin saturated the

---

1. The court later suppressed the statements made to Hessel at an evidentiary hearing on the grounds that Martin had made them without having received appropriate warnings that such statements could be used against him. These

statements nonetheless came into evidence at Martin's trial, albeit for impeachment purposes only, after Martin testified that he had had nothing to do with the fire.

building with a flammable liquid and then arranged for Gordon to start the fire.

Following a three-day trial, a jury found Martin guilty of arson. Pursuant to a procedure no longer required, the court then charged the jury with determining whether to recommend life imprisonment for Martin. After heated deliberations in which two jurors almost came to blows, the jury decided not to recommend life imprisonment. The judge then sentenced Martin to a term of fifty years. Martin appealed both his conviction and sentence.

## II.

Martin raises a number of challenges to his arson conviction. First, he argues that the government failed to prove an interstate commerce connection with the destroyed building. Second, he asserts that the government improperly amended his indictment in the jury instructions. Third, he contends that the district court erroneously allowed the government to impeach him with his testimony regarding the police's failure to provide him with warnings consistent with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Fourth, he claims the court committed reversible error in allowing the government to impeach him with actual statements he made that were admittedly taken in violation of *Miranda*. Fifth, he maintains that the court erroneously allowed the government to introduce evidence of his conversation with Gordon on October 28, a conversation he claims was a custodial interrogation and prior to which he should have been warned. Sixth, he alleges that pre-trial publicity deprived him of his right to a fair trial and that the court should have moved the trial venue. Finally, he argues that the evidence against him was insufficient to justify his conviction. We address each in turn.

## A.

■ Martin first argues that his conviction for arson of a private residence exceeds the statutory authority granted by 18 U.S.C. § 844(i). Martin contends that the apartment at 1414 Highland was neither used in nor affected interstate commerce, as required by § 844(i), because at the time of the fire, the building had been unrented for three months and had no utilities. He asserts, therefore, that the case should be dismissed for lack of jurisdiction.

■ Section 844(i) makes arson of any building or property used in interstate commerce or in any activity affecting interstate commerce a federal crime, providing:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or person property *used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce,* shall be imprisoned for not more than ten years or fined not more than $10,000.00, or both.

(emphasis added). Section 844(i) applies to both businesses and residences, *see United States v. Stillwell,* 900 F.2d 1104, 1107–08 (7th Cir.), *cert. denied,* 498 U.S. 838, 111 S.Ct. 111, 112 L.Ed.2d 81 (1990), and reaches arson of any property having even a *de minimis* connection to interstate commerce. *United States v. Menzer,* 29 F.3d 1223, 1230 (7th Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 515, 130 L.Ed.2d 422 (1994); *Stillwell,* 900 F.2d at 1110; *see also United States v. Ryan,* 41 F.3d 361, 364 (8th Cir.1994) (en banc), *cert. denied,* — U.S. ——, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995); *United States v. Mayberry,* 896 F.2d 1117, 1120 (8th Cir. 1990); *United States v. Voss,* 787 F.2d 393, 397 (8th Cir.), *cert. denied,* 479 U.S. 888, 107 S.Ct. 286, 93 L.Ed.2d 261 (1986). The Supreme Court has read § 844(i)'s "used" language expansively, concluding that "the reference [in § 844(i) ] to '... used in ... any activity affecting interstate commerce' expresses an intent by Congress to exercise its full power under the commerce clause." *Russell v. United States,* 471 U.S. 858, 859, 105 S.Ct. 2455, 2456, 85 L.Ed.2d 829 (1985).

The Court also held in *Russell* that rental properties satisfy this connection and constitute a sufficient nexus to interstate commerce for federal jurisdiction to attach under 18 U.S.C. § 844(i). In *Russell,* Russell was convicted of attempting to burn a two-unit apartment building he owned. The Supreme

Court rejected Russell's argument that the building was not a business or commercial property involved in interstate commerce and determined that the rental of a two-unit apartment building "unquestionably" is an activity affecting commerce within the meaning of § 844(i). The Court further noted that "we need not rely on the connection between the market for residential units and 'the interstate movement of people,' to recognize that the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties." *Id.; see also United States v. Parsons*, 993 F.2d 38, 40 (4th Cir.) (rented single-family dwelling falls within statute), *cert. denied,* —— U.S. ——, 114 S.Ct. 266, 126 L.Ed.2d 218 (1993); *United States v. Medeiros*, 897 F.2d 13, 16 (1st Cir.1990) ("*Russell* thus holds that rental property is *per se* property used in an activity affecting interstate commerce.").

The inquiry does not end here, because Martin contends that since the building was not being offered for rental any longer and was vacant, it was no longer "used" in activity affecting interstate commerce. In *United States v. Doby*, 872 F.2d 779 (7th Cir.1989), we held that a temporarily unrented building was still in "use" in interstate commerce for the purposes of § 844(i). *Doby* adopted the reasoning of the district court, which had concluded that a piece of property that had been vacant for over six months but was still advertised for rent by a sign in the window "had a sufficient relationship to interstate-commerce activity (real estate rental) in order to say that it was being 'used' in that activity." *United States v. Doby*, 684 F.Supp. 558, 561 (N.D.Ind.1988), *aff'd*, 872 F.2d 779 (7th Cir.1989). We also endorsed the district court's observation that "property routinely used in interstate-commerce activity does not lose its interstate *use* simply because of a temporary cessation of that activity." *Id.* (emphasis in original). To date, every circuit to address this question has reached a similar result and rejected arguments like Martin's. *Medeiros*, 897 F.2d at 16 (noting that a "tenant's departure . . . did not necessarily sever the property's ties to interstate commerce for the purposes of § 844(i)"); *United States v. Turner*, 995 F.2d 1357, 1362 (6th Cir.) (noting that "property

routinely used in interstate commerce activity does not lose its interstate characteristics because of a temporary cessation of that activity"), *cert. denied,* —— U.S. ——, 114 S.Ct. 282, 126 L.Ed.2d 232 (1993); *Ryan*, 41 F.3d at 364 (the *de minimis* standard "is easily met, even when the property is temporarily closed or vacant").

One might question if some of these interpretations can go too far. In *Stillwell*, we considered whether "Congress intended the arson statute's interstate commerce requirement to be satisfied in a case where a private residence serves no business purpose and merely receives natural gas from out of state," and answered affirmatively. *Stillwell*, 900 F.2d at 1106; *see also United States v. Patterson*, 792 F.2d 531, 534 (5th Cir.) (noting that use of out-of-state construction materials to build a house would meet § 844(i)'s interstate commerce test), *cert. denied*, 479 U.S. 865, 107 S.Ct. 220, 93 L.Ed.2d 149 (1986). Such logic may be, and has been challenged; after all, the argument goes, one does not really use a building to connect it to a utility, and merely having an out-of-state owner or insurer is not really an activity affecting interstate commerce. *See Ryan*, 41 F.3d at 369–70 (Richard Arnold, C.J., dissenting); *United States v. Mennuti*, 639 F.2d 107, 110 (2d Cir.1981). The Supreme Court's recent decision in *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (declaring the Gun–Free School Zones Act, 18 U.S.C. § 922(q)(1)(A), unconstitutional), also suggests that the winds of interstate commerce jurisprudence may have shifted, albeit slightly, against these expansive understandings of what it means for a building to be "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce."

However, the statutory sufficiency of interstate utilities, ownership, building materials, or insurance does not touch the facts of the instant case, in which we have a rental property still available for rent but otherwise closed to interstate commerce. This rental is the interstate hook on which the government hung its argument and which appeared in the

jury instructions.[2] That may be a slender thread on which to hang an interstate commerce connection, but under *Russell* and *Doby*, it is enough.

Martin argues that *Doby*, although similar, is distinguishable because the residence there, unlike the 1414 Highland property, was offered for rent up to the day of the fire. Although Martin insists that his property had ceased to be a rental unit, the record tells a different story. Prior to its closing, 1414 Highland was "property with firmly established connections to interstate commerce," *Ryan*, 41 F.3d at 365, and the mere fact that a property is temporarily unrented does not reflect its permanent removal from the rental market. Most important, Martin himself testified that the vacancy was only temporary and that he intended to rent the property in the future. During his cross-examination at a preliminary hearing, which testimony was later admitted into evidence at his trial, the following exchange took place between the government (Mr. Merkel) and Martin.

> MR. MERKEL: Was there any effort on your part to rent this premises to anyone in July or August through October?
> MR. MARTIN: Yes. There was an effort.
> MR. MERKEL: So as far as you're concerned, that building was still a piece of rental property available for rent.
> MR. MARTIN: Yes.

Based on these elicited facts, we conclude that the destroyed property had a sufficient relationship to real estate rental, an interstate commerce activity, to satisfy § 844(i).

### B.

■ Martin also contends that the district court improperly amended his indictment in its charge to the jury. Martin notes that the indictment charged him with arson of a "building used in interstate commerce and in activity affecting interstate commerce." The jury instruction regarding this element of his crime contained the word "or" rather than "and." Although the jury instruction correctly stated the law, Martin asserts that this alteration violated the grand jury clause of the Fifth Amendment because his conviction may not have rested on the charges in the indictment; an indictment may not be amended "except by resubmission to the grand jury, unless the change is merely a matter of form." *Russell v. United States*, 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240 (1962); *see also United States v. Spaeni*, 60 F.3d 313 (7th Cir.1995); *Lemons v. O'Sullivan*, 54 F.3d 357, 363–64 (7th Cir.1995); *United States v. Leichtnam*, 948 F.2d 370, 376–80 (7th Cir.1991). Because Martin did not raise this objection at trial, we review the matter for plain error. FED. R.CRIM.PRO. 52(b); *United States v. Olano*, —— U.S. ——, ——, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993); *United States v. Durman*, 30 F.3d 803, 810 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 921, 130 L.Ed.2d 801 (1995).

Martin's argument collapses on the established rule that where a jury convicts a defendant on an indictment charging acts or factors in the conjunctive, the verdict will stand if the evidence is sufficient with respect to any one of those acts or factors. *Turner v. United States*, 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970); *Durman*, 30 F.3d at 810. As we have determined, the government sufficiently proved that the Highland building was used in interstate commerce. The instant case thus bears only a passing resemblance to the scenario in *Leichtnam*, on which Martin relies, in which the court reversed a conviction where the government had charged a defendant with use of a particular rifle and then submitted a jury instruction regarding the use of any firearm. *See Leichtnam*, 948 F.2d at 378–80. *Leichtnam* would only be relevant if the jury

---

**2.** The jury instructions read as follows:

Property is "used in interstate commerce or in any activity affecting interstate commerce" within the meaning of the statute under which the charge in this case is brought when the property is used for business or commercial purposes, such as the rental of an apartment building.

If a piece of property is "used in interstate commerce or in any activity affecting interstate commerce" such as an apartment building or other piece of commercial property, that property does not lose its interstate use simply because of a temporary cessation of that activity, such as when an apartment building becomes temporarily vacant or unrented.

could have convicted Martin on facts lying beyond the scope of the indictment, and that is not the case here.

### C.

■ Martin next contends that the district court erroneously allowed the government to impeach Martin at trial regarding whether anyone had provided him within any warnings after his arrest on October 28 after Martin had testified that he had not received any *Miranda* warnings. Specifically, the government used testimony from a preliminary hearing in which Martin admitted that he was aware that he could speak to his attorney and that he could not be forced to say anything or be asked anything because he had insisted on seeing an attorney. Martin contends that the preliminary hearing testimony was not inconsistent with his direct testimony at trial. Martin also notes that the government had successfully objected to Martin's testifying on direct examination that Martin had not received *Miranda* warnings; the government was thus able to block Martin's testimony and impeach that testimony. Martin made no contemporaneous objection to this impeachment at trial, leaving us to review this evidentiary admission for plain error. *Olano,* —— U.S. at——, 113 S.Ct. at 1779.

On what basis Martin argues that the admission of this impeachment was improper is somewhat uncertain. The government did not impeach Martin with statements he made without constitutional warnings. *See Harris v. New York,* 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971). Rather, the government impeached him with his testimony *about* those warnings. At best, therefore, Martin could object to this testimony as unduly prejudicial or irrelevant under Federal Rules of Evidence 401 and 403 or complain of the court's failure to give a limiting instruction regarding this evidence. The allegedly improper impeachment followed questioning in which Martin denied having received any warnings during the police interrogation. That questioning was appropriate in light of the defense counsel's insinuation during cross-examination of Hayes and Ventimiglia that in not giving Martin the full *Miranda*

warnings verbatim, the police had given him no warnings at all. Additionally, the allegedly improper impeachment followed on the heels of Martin's denial that he had been advised of his *"Miranda* rights, right to an attorney, right that anything you say could be used again[st] you." Although the court did uphold a relevance objection to this inquiry—the question was not pertinent to Martin's culpability—the jury had heard Martin's denial. The court did not commit plain error in allowing this impeachment into evidence.

### D.

■ Martin also challenges the government's use of his prior statements to Officer Hessel to impeach him, statements the government concedes were taken in violation of Martin's Fifth Amendment rights. At trial and outside the presence of the jury, the government warned Martin before he took the stand that the government would impeach him with those statements if he testified inconsistently with them. Martin objected on the grounds that the government had agreed prior to trial not to use the statements and that their use violated *Harris.* The court disagreed and gave Martin time to reconsider whether he still wanted to take the stand. Martin decided to go ahead with his testimony, and after he asserted on direct examination that he had had nothing to do with the fire, the government impeached him with his comments to Hessel.

Contrary to Martin's suggestions, the impeachment at issue falls squarely within the confines of what *Harris* permits; the government used Martin's previous statements to Officer Hessel to show that Martin should not be trusted to tell the truth. Martin also asserts, however, that the court erred in failing to instruct the jury to consider the statements only as impeachment and not as direct evidence, as the trial court had done in *Harris. See* 401 U.S. at 223, 91 S.Ct. at 644–45. While such an instruction is proper and certainly should typically be given when requested, a court does not ordinarily commit plain error when it fails to do so absent such a request. That is especially true in this case, where the district court gave a standard, overarching jury instruction indicating

that prior inconsistent statements "may be considered by you only in determining the credibility of the witness and not to establish the truth of the matters contained in that prior statement." [3]

### E.

■ Martin next asserts that the statements he made to Gordon on October 28 were taken in violation of his Sixth Amendment right to counsel. As Martin correctly notes, he had refused in his October 24 conversation with Agent Lane to speak to anyone without an attorney present. For the next four days, police officers conducted surveillance of Martin, and although no one attempted to interview him, Martin was well aware that he was being watched. When Gordon came to visit Martin, Gordon had agreed to cooperate with the police and was acting as their agent. Thus, Martin concludes, he was subject to a "custodial interrogation." *See Miranda,* 384 U.S. at 443, 86 S.Ct. at 1611–12; *see also United States v. Saadeh,* 61 F.3d 510 (7th Cir.1995).

■ Even if Gordon's conversation with Martin qualified as an interrogation, Martin's argument fails because he has not proven that he was in custody within the meaning of *Miranda.* Custody implies a situation in which the suspect knows he is speaking with a government agent and does not feel free to end the conversation; the essential element of a custodial interrogation is coercion. Such coercion does not exist where an undercover agent elicits statements from a suspect. *Illinois v. Perkins,* 496 U.S. 292, 296–97, 110 S.Ct. 2394, 2396–98, 110 L.Ed.2d 243 (1990). At most, Martin was tricked into speaking when he might have been wiser to remain quiet. But no evidence suggests that Martin, who had not been arrested, spoke because he feared the oppressive arm of the law. His brief interview with Agent Lane followed by sporadic surveillance simply did not create an ongoing custodial situation. The court properly admitted testimony regarding Martin's conversation with Gordon.

### F.

■ Martin also argues that pervasive and prejudicial pretrial publicity in Alton deprived him of a right to fair trial and requires that we overturn his conviction. Martin notes that the deaths of two fire fighters in a town of 30,000 was a major news story in the community and that his trial was well covered by the local media. He claims that the court's voir dire did not satisfactorily remedy that potential for prejudice and that the court erred in not ordering, *sua sponte,* a change of venue.[4] A decision to transfer venue rests within the discretion of the district court, *United States v. Peters,* 791 F.2d 1270, 1296 (7th Cir.), *cert. denied,* 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986), and because the issue is raised for the first time on appeal, we review that decision for plain error only. *Olano,* —— U.S. at ——, 113 S.Ct. at 1779.

Martin's arguments are unavailing. His primary evidence of pretrial publicity is one paragraph from a story in the *Alton Telegraph* noting the town's sorrow at the loss of the fire fighters, a submission that hardly proves a widespread communal rage that would inevitably affect Martin's right to a fair trial. Even adjusting for the smaller size of Alton, the publicity in Martin's case did not begin to compare to the widespread television and press coverage that intruded into and overwhelmed the trials in the two Supreme Court cases, *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), or to the level of notoriety in the one Seventh Circuit case, *United States v. Dellinger,* 472 F.2d 340

---

**3.** The government also points out that it referred in closing argument to the inconsistent statements as being "used to contradict or impeach what he said on the stand." While the text of the closing argument certainly supports this nobler reading of the government's intentions, we could also easily interpret the remarks as in a league with Marc Antony's funeral oration: cynically reviewing Martin's confession in depth while noting that, of course, it is only relevant as impeachment evidence. Given the disparate implications of these comments, we believe they support neither side's contentions.

**4.** Martin also notes that the jury was not sequestered during trial but does not object to that fact on appeal.

(7th Cir.1972) (appeal of the "Chicago Seven" trial), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973), to which he cites, that would lead us to presume prejudice in the absence of a more extensive voir dire examination or change of venue. Martin's failure to object to venue creates an extremely strong presumption in favor of that venue. Indeed, given the fact that the Sixth Amendment endows a defendant with the right to be tried in the district where the crime was supposedly committed,[5] we find it difficult to envision a scenario under which a district court would commit reversible error in neglecting to change venue on its own initiative. *See United States v. Reveron Martinez,* 836 F.2d 684, 687 (1st Cir.1988) ("Reveron Martinez offers no authority for the novel proposition that the district court erred by not acting *sua sponte* and directing the parties to focus on a change of venue. There is no such precedent, we suspect, because there is no such duty."). The record additionally indicates that the court adequately questioned the jury pool regarding its exposure to information about the fire and impaneled only three of the fifteen prospective jurors who had heard about the case. Moreover, each of the three stated during voir dire that they could be impartial and base their verdicts on the evidence in the courtroom. That inquiry was sufficient to the task at hand.

Martin also suggests that evidence of problems among jurors during sentencing deliberations supports his arguments for a new trial. During those deliberations, several jurors contacted a marshall seated outside the jury room and told him that two other jurors were about to fight. Martin moved for a mistrial. The court overruled the motion and declined to voir dire the jury concerning the source of their problems. Instead, the court recalled the jurors and instructed them to take a brief break from deliberations and relax in another part of the building. To the extent Martin argues that this is additional evidence of how trial publicity affected the jurors, it is still insufficient to mandate a new trial under *Sheppard* and *Estes.* To the

extent he appeals his denied motion for a mistrial, he has nothing from which to appeal: the jury decided not to recommend a life sentence after taking its break.

Thus, as with the other challenges Martin has made to his conviction, the district court did not err in the way it conducted voir dire or in not taking it upon itself to move the trial to a different venue.

### G.

Martin next questions the sufficiency of the evidence against him. We will uphold a verdict against a defendant if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). This standard places a heavy burden on the defendant who argues that the evidence against him is insufficient to support the guilty verdict. *E.g., United States v. Theodosopoulos,* 48 F.3d 1438, 1449 (7th Cir.1995).

Martin's statements to Gordon and the testimony of Gordon, Flowers, Detective Hayes, Officer Ventimiglia, and Officer Geil all strongly support the jury verdict. Martin makes plausible arguments regarding the credibility of Gordon and Flowers, but absent evidence that their statements are incredible as a matter of law, this Court may not consider those challenges. *United States v. Saulter,* 60 F.3d 270 (7th Cir.1995); *United States v. Wallace,* 32 F.3d 1171, 1173 (7th Cir.1994). Martin's testimony painted a different picture, but the jury clearly did not believe his version. Additionally, the government proffered evidence that clothing recovered from Martin's house contained traces of heavy petroleum distillate similar to that found on the first floor of the burned building. In sum, the government's case was more than sufficient.

**5.** "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law...." U.S. Const. Amend VI.

## III.

■ Finally, Martin disputes his fifty-year sentence. He argues that that sentence exceeded the scope of the district court's discretion and violated the Double Jeopardy Clause of the Fifth Amendment and the Eighth Amendment's prohibition against cruel and unusual punishment because the jury had determined that he was not to be subjected to life imprisonment. While Martin's constitutional arguments are without merit, *see United States v. O'Driscoll,* 761 F.2d 589, 599 (10th Cir.1985) ("A sentence of imprisonment for a very long term of years, the effect of which is to deny a prisoner eligibility for parole until a time beyond his life expectancy, does not violate the Eighth Amendment prohibition of imposition of cruel and unusual punishment."), *cert. denied,* 475 U.S. 1020, 106 S.Ct. 1207, 89 L.Ed.2d 320 (1986), we conclude that the district court abused its statutory discretion, *see United States v. Guerrero,* 894 F.2d 261, 264–65 (7th Cir. 1990), and therefore remand his case for resentencing.

Understanding this abuse of discretion depends on a reconstruction of the statutory scheme in place when the court sentenced Martin. Prior to November, 1994, § 844(i) indicated that a person convicted of destroying a building by means of fire and where death results "shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title." Section 34, in turn, provided that:

> Whoever is convicted of any crime prohibited by this chapter, which has resulted in the death of any person, shall be subject also to the death penalty or to imprisonment for life, if the jury shall in its discretion so direct. . . .

18 U.S.C. § 34.[6]

After the conviction, the government sought life imprisonment for Martin, thereby triggering the application of § 34. The district court, with the help of counsel, attempted to discern the dictates of § 34, although the record indicates that no one was too certain what the law required, and understandably so, because § 34 set forth no particular procedures. Section 34 clearly gave the jury some role to play in sentencing, but it offered no instruction as to how a jury should debate those factors. Indeed, this omission has led courts to conclude that the death penalty provision of § 34 would not survive a constitutional challenge in light of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). *See United States v. Menzer,* 817 F.Supp. 64, 66 (E.D.Wis.1993) (Evans, J.), *aff'd* 29 F.3d 1223 (7th Cir.1994); *see also United States v. Williams,* 775 F.2d 1295, 1299 (5th Cir.1985), *cert. denied,* 475 U.S. 1089, 106 S.Ct. 1477, 89 L.Ed.2d 732 (1986). In any event, immediately after the jury returned its guilty verdict, both sides presented brief arguments regarding the wisdom of a life sentence. Following these presentations, the court charged the jury, and after the turbulent discussion described earlier, the jury returned its decision refusing to subject Martin to life imprisonment.

The district court held a formal sentencing hearing three months later. At the hearing, both sides appeared to agree to a presentence report that placed Martin's base offense level at 43. That number derived from U.S.S.G. § 2K1.4(c)(1), which requires that if an arson resulted in death, the court must apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person). The presentence report determined that the most analogous guideline was U.S.S.G. § 2A1.1 (First Degree Murder) because 18 U.S.C. § 1111(a) defines a murder committed in the perpetration of any arson as first degree murder. Even with Martin's Criminal History Category I status, however, level 43 would have required the district court to impose a life sentence. Since the jury had already eliminated that possibility,

---

6. Congress amended § 34 in 1994, so that it now provides: "Whoever is convicted of any crime prohibited by this chapter, which has resulted in the death of any person, shall be subject also to the death penalty or to imprisonment for life." Congress also changed § 844(i), so that it now no longer refers to § 34. That change renders this case something of an historical oddity whose precise holding may have a limited reach, although we believe its reasoning applicable beyond this immediate setting.

the court reduced Martin's offense level to 42, thereby offering a range of 360 months to life. Martin argued for a sentence of ten to fifteen years but no more than twenty, since Gordon, who had admittedly started the fire and possessed a criminal history, received only twenty years. The government, emphasizing the damage Martin's arson had caused to lives of the two fire fighters and their families, argued for eighty years. The court imposed a fifty-year sentence.

 Sentencing courts traditionally have substantial discretion to impose any sentence within a statutory range. *Solem v. Helm,* 463 U.S. 277, 290, 103 S.Ct. 3001, 3009–10, 77 L.Ed.2d 637 (1983); *Williams v. Duckworth,* 738 F.2d 828, 831 (7th Cir.1984), *cert. denied,* 469 U.S. 1229, 105 S.Ct. 1229, 84 L.Ed.2d 367 (1985). Appellate review of such matters is limited: A sentence of imprisonment must be proportional to the crime, but outside the context of the death penalty, the principle of proportionality will rarely require reconsideration of a sentence. *Solem,* 463 U.S. at 289–90, 103 S.Ct. at 3009–10; *Rummel v. Estelle,* 445 U.S. 263, 272, 100 S.Ct. 1133, 1138, 63 L.Ed.2d 382 (1980); *see also Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). In analyzing the interplay of §§ 34 and 844(i), we held in *United States v. Prevatte,* 16 F.3d 767, 782–83 (7th Cir.1994), that the submission of the life-imprisonment issue to the jury was mandatory and that the court could not impose a life sentence if the jury did not recommend one. *See also Williams,* 775 F.2d at 1299; *United States v. Hansen,* 755 F.2d 629, 631 (8th Cir.), *cert. denied,* 474 U.S. 834, 106 S.Ct. 105, 88 L.Ed.2d 85 (1985). The question then becomes within what range a court could impose a sentence where that jury recommendation is lacking. *Cf. United States v. Fountain,* 768 F.2d 790, 799–800 (7th Cir.1985) (discussing situation where judge could only impose life imprisonment and not a term of years), *cert. denied,* 475 U.S. 1124, 106 S.Ct. 1647, 90 L.Ed.2d 191 (1986).

 The statutory scheme admits of two reasonable interpretations, depending on the canon of construction one accentuates in interpreting it. First, emphasizing plain language, the "large-bore howitzer of statutory construction," *Matter of Udell,* 18 F.3d 403, 410 n. 1 (7th Cir.1994) (Flaum, J., concurring), § 844(i) indicates that a person shall be subject to imprisonment for "any term of years." Fifty years certainly falls within that range, as would five hundred. Therefore, when the jury declined to recommend a term of life imprisonment, the judge was entitled to sentence Martin to prison for any length of time except life (or death). Moreover, it can be argued, reading restrictions into the phrase "any term of years" would leave the word "any" superfluous. *Cf. Rothgeb v. United States,* 789 F.2d 647, 651–52 (8th Cir.1986); *O'Driscoll,* 761 F.2d at 596. And while one might argue that the distinction is weak, it does have an analog in the realm of real property in the difference between an estate for life and an estate for a term of years. "A gives Blackacre to B for life, then to C," will tend to produce similar results as "A gives Blackacre to B for 100 years, but if B dies, to C," but the two are different in the eyes of the law: The initial portion of the estate for years is definable at the outset, the estate for life is not. *See* 1 RESTATEMENT OF PROPERTY §§ 18, 19 (1936). So it may be with a sentence for a term of years that would exceed life expectancy and a term of life imprisonment.

But if we underscore interpreting the statute to avoid rendering any part of it superfluous, the matter becomes more complicated. Although the judge and not the jury ultimately sentences the defendant, the judge may only impose life imprisonment "if the jury so directs." If the jury does not so direct, the sentence is limited to a term of years. Unless the entire life-sentencing mechanism is a mere formality, that term of years must be less than life. Except in a theoretical sense, giving fifty years (of which at least 42.5 must be served) to a forty-five-year-old is the same as a life sentence and therefore beyond the power of the judge to impose. Additionally, as we recognized in *Fountain,* it is not at all clear that "any term of years" means "any term of years less than the age of the universe" rather than "any term of years less than life." 840 F.2d at 518; *see also Williams,* 775 F.2d at 1299 n. 4

(noting the fact that the parole eligibility statute, 18 U.S.C. § 4205(a), treated terms of years in excess of thirty years similar to life terms "does not alone persuade us that Congress intended the two [types of sentences] to be interchangeable for all purposes").

If we pursue this second argument further, we are faced with the problem as to how to limit these terms. We could establish a rule that any sentence could be no longer than one day less than the defendant's life expectancy at the time of sentencing. Forcing district court judges to use actuarial tables might complicate sentencing, but maybe not much more than the Sentencing Guidelines already have. Indeed, such a system is not even unprecedented. The Mississippi Supreme Court held a statutory scheme analogous to the one in the instant case to require a judge to impose a sentence "for a definite term reasonably expected to be less than life," *Stewart v. Mississippi*, 372 So.2d 257, 258 (Miss.1979), and Mississippi courts following the mandate of *Stewart* have been using the tables ever since. *E.g., Luckett v. Mississippi*, 582 So.2d 428, 430 (Miss.1991); *Henderson v. Mississippi*, 402 So.2d 325, 328–29 (Miss.1981). One might also object that such a scheme would create sentencing disparity, because a twenty-year-old might receive a sixty year sentence for the same crime that a seventy-year-old could receive only ten years, but that disparity would be more illusory than real. Although the terms appear different to the outside observer, they are virtually identical from the sentencers' and the defendants' perspectives: life less one day. The problem is only one of relativity. Furthermore, although other courts have rejected similar challenges to sentencing, *see, e.g., United States v. Berryhill*, 880 F.2d 275, 277–78 (10th Cir.1989), *cert. denied*, 493 U.S. 1049, 110 S.Ct. 853, 107 L.Ed.2d 846 (1990); *Harmon v. Florida*, 438 So.2d 369 (Fla.1983) ("The fact that one-third of the combined total of the consecutive terms of imprisonment may exceed a particular defendant's life

expectancy does not render the terms in excess of the statutory maximum of life imprisonment."), such challenges have not arisen where a statutory scheme has functioned to deny a sentencer the power to impose a life sentence in a particular instance.

In our view, the pre–1994 version of § 34 indicated a Congressional intent to impose real limits on a district court's otherwise broad sentencing discretion. The language of that statute did not permit the defendant to be "subject" to a life sentence unless the jury so decided. If we are to give that legislative decision real meaning, a sentencer cannot be permitted to evade the restrictions on one kind of sentence by imposing a substantially identical one with a slightly different name. We therefore hold that Martin's fifty year sentence, given in the knowledge that Martin would have to serve 42.5 years in prison and that that time span would extend beyond his life expectancy, was beyond the discretion of the district court.[7]

■ We do not here imply that a court can or should disregard mandatory minimum sentences when applying the rule of this case. Such designs operate as a legislative override to the concerns expressed above. *Cf. United States v. Neal*, 46 F.3d 1405 (7th Cir.) (en banc), *cert. granted*, — U.S. —, 115 S.Ct. 2576, 132 L.Ed.2d 826 (1995). If the statutory minimum indicates that a defendant must serve a term of years in excess of her life expectancy, courts are obligated to adhere to that express mandate. Nor do we imply that long sentences are improper where a judge's discretion is limited only to a term of years in the first place. However, where a legislatively enacted sentencing scheme has expressly deprived a court of the possibility of imposing a life sentence, a sentence for a term of years exceeding the defendant's approximate life expectancy would ordinarily constitute an abuse of discretion.

In remanding the case for resentencing, we also note an argument not raised by the

---

7. Our holding today does not conflict with our decision in *United States ex rel. Bongiorno v. Ragen*, 146 F.2d 349 (7th Cir.), *cert. denied*, 325 U.S. 865, 65 S.Ct. 1194, 89 L.Ed. 1985 (1945). In *Bongiorno* we upheld on habeas review a 199-year sentence, the effect of which was to deny the

petitioner an opportunity for parole for a substantially longer period of time than had he received a life sentence. As we recognized, that sentence was clearly permitted under Illinois law and did not violate any federal law. *Id.* at 351–52.

defense on appeal but which the district court may wish to consider. The pre-sentence report determined that Martin's offense level was 43 because it viewed his arson as akin to first degree murder. The federal murder statute, 18 U.S.C. § 1111(a), defines as first degree murder "[e]very murder ... committed in the perpetration of ... any arson." Murder is defined as the "unlawful killing of a human being with malice aforethought." *Id.* Martin's indictment charged him with, and the jury convicted him of, "maliciously" damaging and destroying a building used in interstate commerce, which destruction proximately caused the deaths of two fire fighters. While the scenario just described certainly may be characterized as a felony murder, Martin was not convicted of that crime, and the district court did not specifically find him to have so acted in employing the guideline for first degree murder.

Several courts have concluded that U.S.S.G. § 2A1.1, rather than any other homicide guideline, is properly applied to facts similar to this case. *United States v. Ryan,* 9 F.3d 660, 671 (8th Cir.1993), *modified,* 41 F.3d 361 (8th Cir.1994) (en banc); *United States v. El–Zoubi,* 993 F.2d 442, 449–50 (5th Cir.1993); *United States v. Paden,* 908 F.2d 1229, 1233 (5th Cir.1990), *cert. denied,* 498 U.S. 1039, 111 S.Ct. 710, 112 L.Ed.2d 699 (1991).[8] In *Prevatte,* we also concluded that § 2A1.1 was the proper guideline in a case where an intended explosion unintentionally caused a death. 16 F.3d at 780–82. Our decision in *Menzer* did accept a district court's decision to apply the second degree murder guideline, U.S.S.G. § 2A1.2, to a case in which two persons sleeping in a building were killed when the defendant set fire to the building, although in that case the parties had not challenged the appropriateness of the base offense level determination. 29 F.3d at 1234–35.[9] Because the guidelines ask the sentencer to make an

analogy based on the particulars of the case, we decline to direct the use of one over another here and leave this necessarily fact-intensive inquiry to the district court to undertake first.

Even if § 2A1.1 is the proper guideline for Martin's case, that guideline specifically authorizes downward departures where the defendant "did not cause the death intentionally or knowingly." U.S.S.G. § 2A1.1, application note 1. The court may depart downward as far as the base level for second degree murder, level 33. *Id.* Courts applying § 2A1.1 to arson convictions appear to have taken advantage of this departure, or at least to have recommended it. *See Prevatte,* 16 F.3d at 784; *Martinez,* 16 F.3d at 205; *Ryan,* 9 F.3d at 671–72; *El–Zoubi,* 993 F.2d at 450; *Paden,* 908 F.2d at 1233. In the instant case, the district court departed downward one level to level 42 because it realized it could not impose a life sentence as required by level 43. There is no indication that the court considered the defendant's mental state or any other grounds for departure. On remand, it may depart more than one level, should it find appropriate reasons therefor.

For the foregoing reasons, Martin's conviction is affirmed, his sentence vacated, and the case remanded for resentencing.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

---

8. What the *Paden* court approved is somewhat difficult to discern. In a case in which a fire fighter died trying to fight an arson fire, the district court applied § 2A1.1 but then adjusted downward to level 33, the same as for second degree murder, "because the death of the fire fighter was not caused 'intentionally or knowingly.'" 908 F.2d at 1233. However, the appellate court also described the district court as having

determined that § 2A1.2 was the analogous guideline for one of the defendants. 908 F.2d at 1238.

9. A third case in this circuit, *United States v. Martinez,* 16 F.3d 202, 207–08 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 226, 130 L.Ed.2d 152 (1994), raises the issue without resolving it for these purposes.