

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-30-2002

# USA v. Williams

Precedential or Non-Precedential: Precedential

Docket No. 01-3351

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Williams" (2002). *2002 Decisions.* Paper 460.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/460

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed July 30, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3351

UNITED STATES OF AMERICA,

v.

SHAWN P. WILLIAMS,
        Appellant

Appeal from the United States District Court
For the Western District of Pennsylvania
D.C. No.: 99-cr-00195
District Judge: Honorable Robert J. Cindrich

Argued: June 14, 2002

Before: ROTH, RENDELL, ROSENN, Circuit Judges

(Filed July 30, 2002)

        Christopher A. Feliciani (Argued)
        Berk, Whitehead, Kerr, Feliciani
         & Turin
        115 North Main Street
        Greensburg, PA 15601
         Counsel for Appellant

        Bonnie R. Schlueter (Argued)
        Office of United States Attorney
        633 United States Post Office
         & Courthouse
        Pittsburgh, PA 15219
         Counsel for Appellee

OPINION OF THE COURT

ROSENN, Circuit Judge.

The common law felony of arson was a crime "against another's habitation, not against another's property but against his life and safety at his place of abode." State v. Midgeley, 105 A.2d 844, 845 (NJ 1954). Historically, the states prosecuted the crime of arson not only under common law but also under statutes that expanded its reach. With the passage of the Anti-Arson Act of 1982, Pub. L. 97-298, 96 Stat. 1319 (1982), Congress stated clearly "that federal authorities will henceforth share responsibility with state officials to investigate and prosecute arson crimes." United States v. Gelb, 700 F.2d 875, 879 (2nd Cir. 1983). Specifically, Congress enacted legislation making it a

federal crime to maliciously damage or destroy by fire any building used in interstate commerce or in any activity affecting interstate commerce. 18 U.S.C. S 844(i).1 The primary issue raised on this appeal, one of first impression in this circuit, is whether the arson of a vacant building available for rent but not actually leased at the time of the fire sufficiently affects interstate commerce as to constitute a federal crime.

A jury in the United States District Court for the Western District of Pennsylvania convicted Shawn Williams of malicious destruction of property by fire in violation of S 844(i), and mail fraud in violation of 18 U.S.C. S 1341. The District Court sentenced Williams to 60 months' imprisonment followed by 60 months of supervised release on both counts, to run concurrently. The defendant timely appealed the judgment of conviction and sentence. We affirm.2

_____

1. 18 U.S.C. S 844(i) provides: "Whoever maliciously damages or destroys . . . by means of fire . . . any building . . . used in interstate . . . commerce or in any activity affecting interstate . .. commerce shall be imprisoned for not less than 5 years and not more than 20 years."

2. We have appellate jurisdiction pursuant to 28 U.S.C. S 1291.

2

I.

In the early morning hours of September 23, 1998, a street sweeper smelled and saw smoke rising from the roof of the former state unemployment office on West Otterman Street (Otterman building) in Greensburg, Pennsylvania. Eventually, the fire department brought the fire under control and a fire investigator concluded that the fire had been intentionally set.

Police officer Paul Cyak found four fuel containers in the vacant Otterman building. One of the containers was a blue kerosene-type can with a Sheetz convenience store label with code numbers on it. The can had been delivered to Sheetz in New Stanton, Pennsylvania, late in the evening of September 22, 1998, and it was purchased at 1:32 a.m. on the morning of the fire. The New Stanton Sheetz store was located between Williams's home and the Otterman building.

Officer Cyak learned that in April 1998, Williams and Nat Lamolinara, his ex-business partner, acquired the building for $111,000. Williams and Lamolinara made a down payment of $11,000; Lhormer Realty held the remainder of the mortgage.

From April 1998 until the September 1998 arson, Williams displayed a large banner on the front of the building advertising its availability for rent. He also advertised the property for rent in a local newspaper.

During that period, Lamolinara had on several occasions shown the building to potential tenants. Thomas, at Williams's behest, had also shown the building to Primestar-Excalibur (Primestar), a satellite television company with headquarters in Virginia.

On September 22, 1998, the evening before the Otterman building burned down, Primestar and Williams had negotiated the terms of an agreement to lease the building. Later that evening, Williams faxed the proposed lease to Louis Busato, Primestar's Northeast Regional Sales Manager, who then forwarded the lease to corporate headquarters. Upon corporate approval of the lease, it would have taken effect on September 25, 1998. During the weeks leading up to the arson, Primestar had stopped

looking for other buildings because its "heart was set on this place." Busato planned on moving employees into the building within two to four days of signing the lease.

Although the purchase price for the building was $111,000, it was insured by Lebanon Mutual Insurance Company (Lebanon Mutual) for its replacement value at approximately $500,000. Lebanon Mutual settled Williams's claim, paying $336,000 to Williams and Lhormer Realty, holder of the mortgage. Lebanon Mutual also paid Williams another $64,000 for the cost of removing the debris from the land.

In due course, the Government charged Williams with and convicted him of malicious destruction of property by fire in violation of 18 U.S.C. S 844(i), and mail fraud in violation of 18 U.S.C. S 1341.

II.

Williams raises three issues on appeal: (1) there was insufficient evidence to satisfy S 844(i)'s affecting interstate commerce element; (2) the District Court's jury instruction was plain error; and (3) Congress's failure to provide a "safety valve" for first time offenders underS 844(i) violates the equal protection component of the Fifth Amendment's Due Process Clause. We now turn to the first issue and begin our discussion of the interstate commerce element of the offense.

A property's use in an activity affecting interstate commerce is an essential element of the crime of arson under 18 U.S.C. S 844(i). United States v. McGuire, 178 F.3d 203, 205 (3d Cir. 1999). Like all elements of criminal offenses, the Government must prove the jurisdictional element beyond a reasonable doubt. Id. Williams argues that there was insufficient evidence to establish a sufficient connection between the Otterman building and interstate commerce.3 Because the jury convicted Williams, we review

3. Williams frames the question in terms of federal subject matter jurisdiction. The District Court, however, properly exercised jurisdiction. United States v. Carr, 271 F.3d 172, 178 (4th Cir. 2001) ("[T]he

the evidence in the light most favorable to the Government and will sustain the verdict unless a rational juror could not have found that the Government proved the affecting interstate commerce element beyond a reasonable doubt. United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998).

Williams asserts that the destruction by fire of a vacant building is "clearly a local activity" that is not the concern of the federal government. He, therefore, argues that according to United States v. Lopez, 514 U.S. 549 (1995), for such local activity to become a concern for the federal government, the activity must substantially affect commerce and that a property advertised for rent does not substantially affect commerce.

The federal arson statute, although it does not regulate commercial or economic activity, regulates the damage and destruction of business property that has the requisite interstate nexus. Lopez "did not purport to overrule cases upholding application of the Commerce Clause power to wholly intrastate activities satisfying the requisite nexus to interstate commerce." United States v. DiSanto, 86 F.3d 1238, 1245 (1st Cir. 1996). And, as the United States Supreme Court noted in Lopez, the statute there did not contain a jurisdictional element that "would ensure, through case-by-case inquiry, that the [crime] in question affects interstate commerce." 514 U.S. at 561. Here, however, the statute contains such an element. Accordingly, our analysis is governed by the Supreme Court's opinion in Jones v. United States, 529 U.S. 848 (2000), which specifically addressed this aspect of S 844(i).

_____

'jurisdictional element' is merely one element of the criminal activity . . . and whether it is demonstrated in an individual circumstance does not affect a court's constitutional or statutory power to adjudicate a case.") (internal quotations omitted); see also United States v. Gaydos, 108 F.3d 505, 509 (3d Cir. 1997) ("[W]e join the other circuits which have concluded that S 844(i) remains constitutionally viable after Lopez."). Williams argues instead that the evidence was insufficient to satisfy the interstate commerce element of the offense. Gaydos, 108 F.3d at 509 ("[Defendant's] best argument is that the evidence was insufficient to satisfy the interstate commerce nexus necessary to support her conviction under S 844(i).").

In Jones, the Court addressed the question of whether arson of an "owner-occupied private residence" falls within S 844(i)'s ambit. The Court held that arson of such a dwelling is not subject to federal prosecution under S 844(i). Id. at 850-51. The Court noted that it had previously held

in Russell v. United States, 471 U.S. 858 (1985), that S 844(i) applies to buildings used as rental property. Id. at 853; Russell, 471 U.S. at 862 ("By its terms . . . the statute only applies to property that is 'used' in an 'activity' that affects commerce. The rental of real estate is unquestionably such an activity."); accord Gaydos, 108 F.3d at 509 ("Russell established that renting real estate is an activity that affects interstate commerce for purposes of S 844(i)."). The dispositive factor in Russell was the owner's "renting his apartment building to tenants at the time he attempted to destroy it by fire." Jones, 529 U.S. at 853 (internal quotations omitted). Accordingly, it followed that the building was being used in an activity affecting commerce within the meaning of S 844(i). Id.

The Jones Court contrasted Russell's facts with Jones's. The Court focused on S 844(i)'s use of the phrase "used in interstate or foreign commerce," finding that the key word is "used." Id. at 854. The Court stated that Congress did not define S 844(i)'s crime as arson of a building whose damage might affect interstate commerce, but rather "require[d] that the damaged or destroyed property must itself have been used in commerce or in an activity affecting commerce." Id. (alteration in original) (internal quotations omitted).

Thus, the proper inquiry is an analysis of the "function of the building itself, and then a determination of whether that function affects interstate commerce." Id. (internal quotations omitted). The Court ruled that the word "used" is "most sensibly read to mean active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce." Id. at 855. It held that private, owner-occupied residences are not used in activities affecting interstate commerce and that arson of such buildings therefore does not fall under S 844(i)'s reach. Id. at 856-58.

6

In the instant case, Williams focuses on the Supreme Court's discussion regarding the word "used" and argues that, because the Otterman building had not been leased at the time of the fire,4 it was not, under Jones, being actively employed for commercial purposes. We reject this argument. Gaydos is instructive.

Gaydos involved a defendant who argued that the house she burned down was not rental property because at the time of the arson it was vacant, uninhabitable, and she had no intention of renting it again. 108 F.3d at 507. We agreed with the defendant, holding that the trial record did not support a finding that the house at issue remained in or was intended to return to the stream of commerce. Id. at 510. We first noted that the record demonstrated that all tenants had vacated the house and that the house was uninhabitable at the time of the arson. Id. We then stated that there was no evidence that the defendant had any intent to improve the living conditions in the building. Id.

Finally, we found no evidence rebutting the defendant's contention that the house had "been permanently removed from the rental market and had no prospect of generating any future rental revenue." Id. at 510-11.

Although ruling in favor of the defendant, in dicta we stated that a temporary cessation of activity at a business property does not place the property beyond the reach of S 844(i). Id. at 509 ("This argument has been accepted by every Court of Appeals that has addressed the issue."); accord United States v. Martin, 63 F.3d 1422, 1427 (7th Cir. 1995) (holding property vacant and not rented for three months but still available for rent did not lose its commercial character by virtue of the temporary cessation

_____

4. At oral argument Williams repeatedly referred to the Otterman building as "abandoned." "Abandoned property" is defined by Black's Law Dictionary as "[p]roperty that the owner voluntarily surrenders, relinquishes, or disclaims." BLACK'S LAW DICTIONARY 1233 (7th ed. 1999). Williams actively sought to lease the building in the months before the arson. He did not -- voluntarily or otherwise-- surrender, relinquish, or disclaim his interest in the building. Therefore, the Otterman building was not an abandoned building, but was an unoccupied building available for rent.

of activity). We thus interpreted the collective case law as suggesting that

> once the business nature of the property at issue is
> established, courts will presume, absent indicia of an
> intention to permanently remove the property from the
> stream of commerce, that the requisite nexus between
> the property and interstate commerce is satisfied,
> notwithstanding temporary changes or modifications in
> the use of the property.

Gaydos, 108 F.3d at 510. In contrasting Gaydos's holding with other cases, we stated that

> in each of th[o]se cases, however, there was a clear
> intention that the property at issue either remain in, or
> return to, the stream of commerce. . . . [T]he trial
> records in th[o]se cases demonstrate that the particular
> properties were treated by their owners as if they had
> never left the stream of commerce.

Id.

Here, in contrast to Gaydos, a reasonable trier of the facts could have concluded that Williams intended the building, at the very least, to return to the stream of commerce. He actively pursued such a course. Evan Thomas, the building's former owner, testified that, from April 1998 until the September 1998 arson, there was a sign in front of the Otterman building advertising office space for lease. Lamolinara, Williams's ex-business partner,

testified that there was a banner advertising space for lease, and an advertisement for the same in a local newspaper. Lamolinara also testified that he had shown the building "several times . . . to potential tenants." Thomas testified that he had, at Williams's behest, shown the building to Primestar.

Furthermore, Louis Busato, Primestar's Northeast regional manager, testified that he and Williams had negotiated terms to lease the Otterman building. Indeed, the proposed lease had been drafted by Williams and faxed over the evening before the building burned down. The arson occurred on September 23, 1998; the lease was supposed to commence on September 25, 1998. Busato

8

planned to move employees into the building within two to four days of signing the lease because conditions were so cramped at their present location. Primestar had even stopped looking for a building because its "heart was set on this place." Thus, Primestar relied on its belief that it would soon occupy the Otterman building and terminated its search for other rental space. It can be reasonably assumed that Primestar, a Virginia corporation negotiating to lease Pennsylvania property, had its interstate commercial activities disrupted when it learned of the destruction of the Otterman building. A rational trier of the facts could find that this satisfied the requisite interstate commerce nexus.

On the other hand, Williams asserts that United States v. Ryan, 227 F.3d 1058 (8th Cir. 2000), supports his position. Ryan involved the arson of a permanently closed fitness center. The Court held that an earlier panel's conclusions that the Fitness Center was (1) about to be placed on the market for sale, and (2) had the potential for commercial re-entrance, did not satisfy the interstate commerce element of S 844(i). Id. at 1063-64. The Court noted that the property "was not formally listed for sale or rent at the time of the fire." Id. at 1060. This case is completely different.

In contrast with the building in Ryan, Williams's Otterman building was available for rent at the time of the fire; the lease execution was in the process of consummation. Moreover, the conclusion that the interstate commerce element is satisfied is not based merely on predictions of the building entering commerce or its potential for commercial re-entrance, but rather is based on the Otterman building's actual entrance on the market: it had been available for rent for the six months preceding the arson. Ryan, therefore, is not on point.

Williams's argument ultimately hinges on an overly-literal and narrow definition of the word "used." As the Government points out, "[t]he logical extension of this would be a holding that federal jurisdiction does not attach at night, because the business employees are at home sleeping, and no one is actually putting the building itself to active use in interstate commerce." The District Court

wisely noted the sophistry of Williams's argument when it inquired: "[S]uppose the tenant signed the lease but doesn't

move into the building next week? Would we say then it's not actively in interstate commerce?" As Gaydos suggests, "once the business nature of the property at issue is established, courts will presume, absent indicia of an intention to permanently remove the property from the stream of commerce, that the requisite [interstate commerce] nexus" exists. 108 F.3d at 510. Here, the evidence of Williams's leasing activities established the business nature of the Otterman building before its arson. Accordingly, there was sufficient evidence for a reasonable trier of the facts to conclude that the interstate commerce nexus had been satisfied.

III.

Williams further argues that the District Court erred in its jury instructions. Because Williams did not raise the objection at trial, we reverse only if we find plain error. United States v. Wolfe, 245 F.3d 257, 260-61 (3d Cir. 2001). The plain error standard is satisfied when the District Court's error is obvious or clear and is deemed to have affected the substantial rights of the party. Id. at 261. An error affects the substantial rights of a party if it is prejudicial. Id.

Under plain error review, the defendant bears the burden of establishing that the error prejudiced the jury's verdict. Id. Even if the defendant establishes plain error, Federal Rule of Criminal Procedure 52(b) provides this Court with discretion whether to correct the error.5  Id. We are not required to correct the error. Id. Instead, we reverse when the defendant is actually innocent or where, regardless of the defendant's innocence, the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id. (alteration in original) (internal quotations omitted).

Williams asserts that the District Court committed plain error by instructing the jury to determine whether the

_____

5. The rule provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

property was used in "an activity affecting interstate commerce" rather than modifying "commerce" with the word "substantial" to track Lopez's language. The instructions, however, must be looked at as a whole in order to determine whether the jury was apprised of the issues and applicable law. Limbach Co. v. Sheet Metal

Workers Int'l Ass'n, 949 F.2d 1241, 1259 n.15 (3d Cir. 1991).

The District Court instructed the jury as follows:

> The word "commerce" refers to all of the various types of economic relationships which may exist between parties, such as buying, selling, bartering or renting. . . . .
>
> The phrase "interstate commerce" means commerce which affects more states than one. . . . It also includes activities wholly within a given state, but which ha[ve] a substantial effect on commerce between or among the states.
>
> The phrase "used in interstate commerce or used in an activity affecting interstate commerce" means active employment for commercial purposes, and not merely a passive, a passing, or a past connection to commerce.
>
> The determination of whether property is used in interstate commerce or in an activity affecting interstate commerce, should focus on the function of the property and whether that function affects interstate commerce.
>
> In this case, you must make a determination as to the function of the [Otterman] building . . . at the time of the fire, and then you must make a determination of whether that function affected interstate commerce.

The Court's instructions tracked S 844(i)'s language. Section 844(i)'s language refers to destroying a building used "in any activity affecting interstate or foreign commerce." Thus, the statutory language lacks Lopez's "substantial" modifier, and speaks only of an activity affecting -- not necessarily substantially affecting -- interstate commerce. Indeed, the District Court started this

11

part of its instruction by quoting the statutory language by referring to "[t]he phrase 'used in interstate commerce or used in an activity affecting interstate commerce.' " Therefore, in the subsequent instructions, the Court spoke of the jury's responsibility, pursuant to S 844(i)'s statutory language, to determine whether "property is used in interstate commerce or in an activity affecting interstate commerce."

Post-Lopez case law from the Supreme Court also speaks in terms of "affecting commerce," and not"substantially affecting commerce." In Jones, the Court noted that Congress required that the destroyed property have been used in an activity affecting commerce before such arson is covered under S 844(i). 529 U.S. at 854. It framed the inquiry as one aimed at determining whether the function

of the building "affects interstate commerce." Id. (internal quotations omitted). Even in the post-Lopez environment, the Supreme Court did not interpolate "substantial" into S 844(i)'s language.

Furthermore, it is doubtful that lay jurors comprehend the distinction between activities that affect interstate commerce and activities that substantially affect interstate commerce. Because S 844(i)'s affecting interstate commerce provision is an element of the criminal offense, a defendant is entitled to a jury determination of whether the element has been satisfied beyond a reasonable doubt. Apprendi v. New Jersey, 530 U.S. 466, 477 (2000). As a matter of law, however, arson of an unoccupied building available for rent is sufficient to satisfy S 844(i)'s jurisdictional element. Therefore, the significant factual question put to the jury was whether the building was available for rent at the time of the arson. On appeal, Williams does not dispute that the building was available for rent.

A District Court's instruction tracking the exact language of a statute is not plain error, or indeed error at all. Moreover, even if it were error, there is no evidence establishing Williams's innocence.

IV.

Finally, Williams argues that S 844(i) violates the Fifth Amendment's equal protection component because it does

not provide him with access to 18 U.S.C. S 3553(f). Section 3553(f) is a safety valve provision that permits "less culpable defendants in drug-related crimes who fully assist the Government to avoid the application of the mandatory minimum sentence." United States v. Pratt, 87 F.3d 811, 812-13 (6th Cir. 1996). Williams's argument is devoid of merit.

We apply rational basis review to Williams's constitutional challenge. United States v. Hawkins, 811 F.2d 210, 216 (3d Cir. 1987). We will uphold the legislation if it bears a rational relation to a legitimate Government purpose. Id. Legislation is irrational if it creates a classification wholly irrelevant to achieving its objective. Id.

Section 3553(f) provides a safety valve for some drug offenders, so that they can avoid draconian mandatory minimum sentences. There are five factors that must be satisfied before a drug offender has access to the safety valve. Assuming arguendo that S 3553(f) applies to federal arson, two of the conditional factors make Williams ineligible for the provision. First, the defendant must not have used violence in connection with the offense. 18 U.S.C. S 3553(f)(2). Arson is, however, an inherently violent act, and Williams therefore cannot satisfy that condition. Second, the defendant must have "truthfully provided to the Government all information and evidence the defendant

has concerning the offense." 18 U.S.C. S 3553(f)(5). Williams has yet to admit his culpability and has not provided the Government with any information relating to the offense. Thus, he cannot satisfy that condition. Accordingly, even assuming Williams's eligibility for the safety valve, he does not satisfy two of the five prerequisites.

However, Congress plainly had a rational basis for not providing a safety valve for federal arson. As the District Court held, providing a safety valve for nonviolent first-time drug offenders has a rational relationship to the legitimate Government goal of providing exceptions to draconian mandatory minimum sentences for such individuals. On the other hand, held the Court, it is entirely rational that Congress would not create such an exception for arson, "which is an extremely dangerous and violent offense," and by definition is excluded from the safety valve. The Court

13

cogently continued: "Arson is not a nonviolent offense. For that reason, it seems to the Court clear that Congress saw a rational distinction between drug offenses carried out in some nonviolent way and crimes which by their very nature involve violence."

Skinner v. Oklahoma, 316 U.S. 535 (1942), which Williams cites, is of no avail and indeed even cuts against him. Skinner involved an Oklahoma practice of sterilizing habitual criminals. Id. at 536-37. The Court noted that the equal protection clause does not prevent legislatures from recognizing degrees of evil, and legislating accordingly. Id. at 540. A state need not ignore experience that marks a class of offenders or offenses for special treatment. Id. The Court, however, distinguished Skinner's facts: "We are dealing here with legislation which involves one of the basic civil rights of man." Id. at 541. Therefore, the Court held that strict scrutiny applied and invalidated the law. Id. at 541-42.

Williams's equal protection challenge, in contrast to Skinner, does not concern a basic civil right; it is not subject to strict scrutiny, but to a rational basis review. Congress rationally could have concluded that it did not want to provide a safety valve for first-time violent offenders. Indeed, as noted earlier, even first-time drug offenders are not eligible for the safety valve if the crime involved violence. Congress's decision to deny a safety valve for first-time violent offenders rationally relates to its legitimate interest in providing such a safety valve for first-time non-violent drug offenders. Accordingly, the District Court did not err in ruling that S 844(i)'s lack of a safety valve does not violate the equal protection component of the Fifth Amendment's Due Process Clause.

V.

In summary, the Government produced sufficient evidence to satisfy the interstate commerce element and

convict Williams of violating S 844(i). Furthermore, the District Court committed no reversible error in its jury instruction or in holding that S 844(i) does not violate Fifth

14

Amendment equal protection. Accordingly, the District Court's judgment will be affirmed.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

15