**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Harvey WING, Defendant–Appellant.**

No. 96–1868.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 3, 1996.

Decided Jan. 16, 1997.

Daniel P. Bach, Rita Marie Klemp (argued), Office of the United States Attorney, Madison, WI, for plaintiff–appellee.

David L. Mandell, Rick B. Meier (argued), Mandell, Ginsberg & Meier, Madison, WI, for defendant–appellant.

Before ESCHBACH, FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

On January 5, 1995, a federal jury convicted Harvey Wing, along with co-defendant Joey Hicks, of arson in violation of 18 U.S.C. § 844(i).[1] The evidence indicated that Wing had hired Hicks to start the fire that ignited on August 14, 1990 in an apartment owned by Wing and located above his Portage, Wisconsin restaurant, "Mr. Harvey's." Near the

---

1. In relevant part, § 844(i) makes it a crime to "maliciously damage[] or destroy[], ... by means of fire or an explosive, any building ... or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce...."

close of the four-day trial, during the prosecution's rebuttal argument, the district court judge lost patience with Wing, who apparently had been directing some meaningful body language toward the jury. The following exchange took place among the court, Wing, and his trial counsel:

THE COURT: Mr. Wing, I am not sure you are aware of it, but you are making gestures with your head and have been continuously throughout Mr. Bach's argument. You are not permitted to testify in that matter. Do you understand that?

MR. WING: Yep.

THE COURT: If you wanted to testify you could have taken the stand.

MR. WING: Thank you.

THE COURT: You cannot sit there and nod and shake your head and talk in that manner with the jury.

MR. WING: All right.

THE COURT: The jury should understand that any gestures or expressions or whatever on Mr. Wing's face are something that they cannot consider when they are deliberating on the verdict in this case.

MR. MANDELL [Defense Counsel]: I would ask that also apply to Special Agent Kelm [a government witness]. I have been catching him throughout closing argument and trial. He has been laughing, gesturing, all the way through various witnesses. I think it should go both ways.

THE COURT: I have been watching him, too. I have not seen anything I thought was inappropriate. As long as we are speaking, I would like you not to nod or shake your head as well.

Defense counsel did not otherwise object, and the prosecutor resumed his closing remarks.

Following the verdict, Wing filed a motion for a new trial in which he raised the two points of error that he now presses on appeal. He argues, first, that the district court, in the course of the above-quoted exchange, violated his Fifth Amendment rights under *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), by impermissibly commenting upon his decision not to testify. Second, he contends that the jury

should have been instructed that they were required to find a "substantial" nexus between interstate commerce and the property damaged in the fire. We conclude that neither of Wing's arguments provides a ground for reversal of his conviction.

## I.

■ With respect to the *Griffin* claim, the parties disagree over our standard of review. Wing did not object until after trial to the court's observation that he "could have taken the stand" had he wished to testify. The government therefore urges us to review the court's comments for plain error. See Fed. R.Crim.P. 52(b). Wing concedes that trial counsel did not object contemporaneously, but argues that to have done so would have compounded the harm by drawing the jury's attention to the court's inappropriate remarks. Given the realities of the situation, he suggests, the post-trial motion presented the first opportunity to object. In light of trial counsel's delicate position, Wing asks us to order a new trial unless the government can establish that the court's error was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

■ We cannot agree that the post-trial motion was Wing's first opportunity to object to the court's comments. If the improvident remarks were as prejudicial as Wing now claims, it was incumbent upon his trial counsel to make his objection on the record at the time of the court's transgression. Moreover, a review of the trial transcript belies the assertion that counsel had no earlier opportunity to object. In fact, counsel's reaction to the court's remarks was not to sit quietly and hope that the rebuke would be forgotten in the rush of events, but rather to extend the interruption by asking the court to similarly admonish a government witness. To have interposed a prompt objection would therefore have caused no additional delay, nor would it have drawn more attention to the court's statement. In addition, the transcript indicates that there was a court-imposed pause between the end of the prosecution's rebuttal and the commencement of the

jury charge.[2] This brief hiatus provided yet another opportunity for counsel to object. If necessary, counsel could have requested a side-bar conference in order to prevent a discussion of the issue before the jury. Because counsel had more than ample opportunity to make his objection known to the court during trial, when the court promptly could have cured any error, we must regard his failure to do so as a failure to preserve the issue for appeal. We consequently will vacate the judgment of conviction only if the court's remarks constituted plain error.

▪ Quite apart from our standard of review, we do not hesitate to express our concern over the district court's remarks, which were uttered in a state of evident exasperation. The district judge's frustration with Wing was understandable. Yet neither the empathy of appellate judges who may have once been trial judges, nor their respect for a learned and most able colleague, should deter them from exercising their duty to pass upon the propriety of proceedings below. In the case at bar, the preferred course would have been to have called counsel to the bench and to have instructed him to curb his client's excesses. If the judge felt obliged to address Wing directly, it was sufficient to warn him to stop gesturing and to instruct the jury that it should disregard his body English. The availability of these lesser alternatives—short of reminding Wing that he "could have taken the stand"—only underscores the unfortunate nature of the trial court's comments.

▪ Whether these comments amounted to plain error under Federal Rule of Criminal Procedure 52(b) is a more difficult question. Plain error has remained an elusive concept over the years, but certain parameters do emerge from the caselaw. This court frequently has characterized plain error as error so grave that it results in a "miscarriage of justice." *See United States v. Waldemer,* 50 F.3d 1379, 1385 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2598, 132 L.Ed.2d 845 (1995); *United States v. Toney,* 27 F.3d 1245, 1250 (7th Cir.1994). The Su-

preme Court waded into this area in *United States v. Young* to caution that "the plain-error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those cases in which a miscarriage of justice would otherwise result.'" 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting *United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982)). Subsequently, the Court has emphasized that the plain-error doctrine looks not only to the gravity of the alleged error but also to whether the defendant has been prejudiced as a result of the error: "[The error] must have affected the outcome of the District Court proceedings." *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993). Perhaps most significant, unlike *Chapman*'s harmless error standard, under which the government must establish that the claimed error was harmless beyond a reasonable doubt, Rule 52(b) places upon the defendant the burden of demonstrating prejudice. *Id.* at 734–35, 113 S.Ct. at 1777–78. Wing therefore could succeed on this appeal only if he could establish both that the district court's remarks violated his rights under the Fifth Amendment and that they prejudiced him, in the sense that they likely altered the outcome of his trial.

Whether the court's comments did in fact violate *Griffin,* as the Supreme Court has interpreted that opinion in subsequent decisions, is a closer question than Wing appears to believe. Wing assumes that they did, and proceeds to offer a framework by which we are to decide whether the remarks were harmless beyond a reasonable doubt. His discussion is largely unhelpful, however, because, for reasons we have indicated, the harmless-beyond-a-reasonable-doubt standard is not appropriate in this context; and even if it were the correct standard, the case to which he refers us, *Lent v. Wells,* 861 F.2d 972 (6th Cir.1988), is concerned with the proper test for evaluating indirect references to an accused's failure to testify. Adding to this confusion, the government, in its respon-

---

**2.** When the prosecutor had concluded his remarks, the court addressed the jury: "Ladies and gentlemen, I suggest we stand up and stretch for

a minute before I start the instructions. It won't take long but you have been sitting a while."

sive brief, invites a rather unproductive debate over whether the district court's comments in this case constituted an "indirect" or a "direct" reference to Wing's failure to testify. We say "unproductive," because we can imagine little so direct as the district court's observation that Wing "could have taken the stand" had he wished to testify. But the directness of the court's comments is not the central issue presented by this appeal.

The more relevant inquiry is whether the court's remarks embody the evil to which *Griffin* addressed itself: the invitation to infer guilt from a defendant's decision not to take the stand.[3] Although *Griffin* can be read to prohibit any direct reference to a defendant's failure to testify, and we have at times cited it in *dicta* to that effect, *see, e.g., United States v. Cotnam,* 88 F.3d 487, 497 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 326, 136 L.Ed.2d 240 (1996); *United States v. Goodapple,* 958 F.2d 1402, 1405 (7th Cir.1992), the Supreme Court in recent years has declined to adopt such a broad reading of *Griffin.* In *Lakeside v. Oregon,* 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978), the Court rejected the contention that the trial court violated the Constitution when it delivered, over defense objection, an instruction cautioning the jury not to draw an adverse inference from the defendant's decision not to testify.[4] *Griffin,* the Court explained, was "concerned only with adverse comment, whether by the prosecutor or the trial judge—'comment by the prosecution on the accused's silence or instructions by the court that such silence or instructions by the court

that such silence is evidence of guilt.' " *Lakeside,* 435 U.S. at 338–39, 98 S.Ct. at 1094 (citing *Griffin,* 380 U.S. at 615, 85 S.Ct. at 1233). More recently, in *United States v. Robinson,* 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988), the Court examined a case in which the prosecution responded to defense counsel's claim that the government had not provided Robinson an opportunity to explain his side of the story. The Court held that the prosecutor's response, that Robinson "could have taken the stand and explained it to you," did not violate Robinson's rights under the Fifth Amendment. *Id.* at 26, 108 S.Ct. at 866. The position that "any 'direct' reference by the prosecutor to the failure of the defendant to testify violates the Fifth Amendment as construed in *Griffin* " was, in the Court's view, "inconsistent with the Fifth Amendment, which protects against compulsory self-incrimination." *Id.* at 31–32, 108 S.Ct. at 868. Consequently, "[t]he broad dicta in *Griffin* to the effect that the Fifth Amendment 'forbids ... comment by the prosecution on the accused's silence,' must be taken in the light of the facts of that case." *Id.* at 33–34, 108 S.Ct. at 870 (internal citations omitted).

Both *Robinson* and *Lakeside* are factually distinguishable from the present case. In *Lakeside,* the instruction that "a defendant has the option to take the witness stand," 435 U.S. at 335, 98 S.Ct. at 1092, was uttered in the same breath as the admonition not to infer guilt from failure to do so. In *Robinson,* the observation that the accused "could have taken the stand" came from the prose-

---

**3.** We more typically confront cases in which the prosecution has attempted to skirt *Griffin* 's prohibition by making indirect reference to an accused's silence, for example, by arguing that the evidence is "uncontradicted" or "unrebutted." *See United States v. Cotnam,* 88 F.3d 487, 497 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 326, 136 L.Ed.2d 240 (1996); *Freeman v. Lane,* 962 F.2d 1252, 1254, 1260–61 (7th Cir.1992); *Williams v. Lane,* 826 F.2d 654, 664–65 (7th Cir.1987); *see also Dortch v. O'Leary,* 863 F.2d 1337, 1343–44 (7th Cir.1988) (involving prosecutor's direct comments on defendant's failure to testify). In those cases, we have recognized that such references amount to an unconstitutional comment on the accused's failure to testify. Whether labeled direct or indirect, the allusion to the defendant's silence in such cases violates *Griffin* by inviting an adverse inference and thus

penalizing the defendant for exercising his or her right not to testify. It would be a mistake for prosecutors, or trial courts to interpret today's holding as in any way undermining this line of cases.

**4.** It is noteworthy that the instruction at issue in *Lakeside* began by reminding the jury that the defendant did have the right to testify:

Under the laws of this State a defendant has the option to take the witness stand to testify in his or her own behalf. If a defendant chooses not to testify, such a circumstance gives rise to no inference or presumption against the defendant, and this must not be considered by you in determining the question of guilt or innocence.

435 U.S. at 335, 98 S.Ct. at 1092.

cution, rather than the court, and answered a claim by defense counsel that arguably merited a stronger response than did Wing's body language in this case. But the emphasis in the Supreme Court's jurisprudence upon the prohibited inference of guilt as the rationale underlying *Griffin* casts doubt upon Wing's claim that the district court violated his Fifth Amendment rights within the meaning of that case.

We need not definitively resolve this question, however, because, turning to the prejudice component of our plain error inquiry, we conclude that Wing has failed to convince us that the district court's remarks were sufficiently prejudicial to warrant reversal. Independent of the constitutional question, the nature and context of the district court's remarks do not suggest prejudice. The court did not ask the jury to draw an adverse inference from Wing's failure to testify. Moreover, while it is often logical to interpret a reference to a defendant's decision not to testify as an invitation to infer guilt, in the setting of this case it was clear that the court intended merely to rebuke Wing for his behavior and to emphasize that his nonverbal communications were not to be regarded as testimony. Because the immediate reason for the court's rebuke was evident, the jury was not likely to take the logical leap that *Griffin* seeks to prevent.[5]

In addition, the evidence against Wing was substantial. The government's theory of the case was that Wing hired Hicks to set fire to the building containing Wing's restaurant and apartment, that Hicks had enlisted the assistance of Fred Cavanaugh, who was a juvenile at the time of the crime and who ultimately testified for the government, and that Hicks and Cavanaugh had returned to the building to commit the arson after an unsuccessful attempt on the night prior to the fire. In an effort to demonstrate prejudice, Wing now points to certain weaknesses in the government's case. He argues, first, that the testimony of Cavanaugh, who was

not indicted, was unreliable and inconsistent with other evidence presented at trial. Next, he suggests that the disclosure that Hicks's wife, Christine Hicks, had an "extramarital rendezvous" with Cavanaugh's brother, casts doubt upon her impartiality and therefore upon her testimony linking Wing with Hicks. Finally, Wing observes that the government's proposed motive—Wing's financial difficulties—is questionable in light of the fact that all of his debts were secured. Yet the supposed chinks in the government's armor appear relatively insignificant when one considers the evidence essentially corroborating Cavanaugh's version of events. For example, telephone records indicating that two calls were placed from the restaurant to Hicks's residence between the time of the unsuccessful arson attempt and the actual fire support Cavanaugh's testimony to the effect that Hicks received a call from the owner of the building exhorting him to complete the job. Moreover, Wing's argument that he had no motive to commit the crime because "all of his debts were secured," enabling him to "walk[ ] away from the business without resort to arson," is unpersuasive in light of evidence that, in addition to four mortgages on the damaged property, Wing had outstanding personal debts and utility bills, and owed back taxes to the IRS and the City of Portage. In short, when we consider the weight of the government's case and the context of the court's remarks, we conclude that those remarks, though ill-considered, did not constitute plain error.

## II.

■ Wing next argues that the district court's jury instruction regarding the jurisdictional element of 18 U.S.C. § 844(i) was erroneous. The court's charge explained to the jury that the statute required the government to prove "that the real property was used in an activity affecting interstate commerce."[6] Wing, however, would have had

5. The government points out that the district court recited the usual instruction that the jury should not consider the defendants' decision not to testify. We ascribe little weight to this factor: "This court has repeatedly held that this type of jury instruction is 'ordinarily not sufficient' to

cure constitutional errors." *Dortch*, 863 F.2d at 1344 n. 4.

6. The instruction went on to define interstate commerce: "The term interstate commerce means travel, trade, traffic, commerce, transpor-

the court insert the word "substantially" between "activity" and "affecting." The court rejected his proposed instruction on the authority of *United States v. Martin,* 63 F.3d 1422 (7th Cir.1995), in which this court, though recognizing "that the winds of interstate commerce jurisprudence may have shifted" in the wake of *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), reaffirmed that § 844(i) requires only a *de minimis* connection to interstate commerce. *See Martin,* 63 F.3d at 1426. Wing concedes that *Martin* appears to control, but requests that we reconsider *Martin* in light of *Lopez*—even though *Martin* was decided after *Lopez* and considered *Lopez*'s effect.

■ We decline to revisit the issue we decided in *Martin.* Were we inclined to do so, Wing's appeal would not present the occasion. In contradistinction to Wing's dual-purpose property, which housed a residential apartment and a commercial enterprise, we dealt in *Martin* with a vacant apartment building, "still available for rent but otherwise closed to interstate commerce." 63 F.3d at 1427. Here, in addition to the gas service and insurance coverage provided by out-of-state entities, the government presented evidence that Wing's restaurant ordered food shipped in interstate commerce. *See United States v. Gomez,* 87 F.3d 1093, 1097 (9th Cir.1996) (approving jury instruction that building is used in interstate commerce "if the building itself is used for a business or commercial purpose or if that building purchases, sells, or uses good that originated or came from out of state"); *cf. United States v. Pappadopoulos,* 64 F.3d 522, 525 (9th Cir. 1995) ("To establish this jurisdictional element, the government relied exclusively on one theory: that the Pappadopoulos residence was 'used in' or 'used in an activity affecting' interstate commerce because it received natural gas from out-of-state sources."). Even under the jurisdictional test proposed by Wing, therefore, the government proved its case.

For the foregoing reasons, the order of the district court denying Wing a new trial is AFFIRMED.

ESCHBACH, Circuit Judge, dissenting.

The majority rejects Wing's *Griffin* claim by holding there was no plain error. Although not "definitively resolving the issue," it also goes to great length to express its "doubt" as to whether there was constitutional error at all. This dicta is unnecessary, and the doubt unwarranted.

This circuit recognizes the principle that "[d]irect comment on a defendant's failure to testify is forbidden by the Fifth Amendment." *United States v. Cotnam,* 88 F.3d 487, 497 (7th Cir.1996); *see also United States v. Goodapple,* 958 F.2d 1402, 1405 (7th Cir.1992) ("A direct comment on the defendant's failure to testify is clearly a fifth amendment violation."). True, this principle is not without exception, and the court cannot find a constitutional violation without examining the facts of the case. *United States v. Robinson,* 485 U.S. 25, 32–33, 108 S.Ct. 864, 869, 99 L.Ed.2d 23 (1988). But the fact that this principle is not an absolute does not warrant the majority's apparent disregard for it.

The majority recognizes that the cases establishing exceptions to this principle, *Robinson,* 485 U.S. 25, 108 S.Ct. 864, and *Lakeside v. Oregon,* 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978), are "factually distinguishable." In fact, they are inapposite and do not support the majority's dicta to the effect that there was no constitutional error in the instant case. Both cases involved facts that mitigated the risk that the jury would infer guilt based on the challenged comment. In *Lakeside,* the reference to defendant's silence was collateral to a contemporaneous instruction that the jury should not infer guilt from that silence. 435 U.S. at 333–34, 98 S.Ct. at 1092. This difference is particularly significant here, where the court gave no curative instruction after its comment. In *Robinson,* the prosecutor's comments came as a direct response to defense counsel's

---

tation or communication among several states. To show that real property was used in activity affecting interstate commerce, the government

need only establish a minimal connection between the real property at issue and some aspect of interstate commerce."

attempt to convert Fifth Amendment protection "into a sword" by arguing that the government prevented the defendant from testifying. 485 U.S. at 32, 108 S.Ct. at 869. In the instant case, there are no similar facts that make it unlikely the jury would draw an adverse inference from the court's comment.

The majority's "doubt" that there is a Fifth Amendment violation focuses on whether the court's comment invited the jury to infer guilt. I believe it did. The court did not invite this inference explicitly, nor, I think, intentionally. Nonetheless, the comment made it more likely the jury would infer guilt from defendant's silence.

The Supreme Court recognized in *Griffin* that it may be only natural for a jury to infer guilt from a defendant's failure to testify. *Griffin v. California*, 380 U.S. 609, 614, 85 S.Ct. 1229, 1232–33, 14 L.Ed.2d 106 (1965). However, "[w]hat the jury may infer, given no help from the court, is one thing. What it may infer when the court solemnizes the silence of the accused into evidence against him is quite another." *Id.* at 614, 85 S.Ct. at 1233. Although the judge in this case did not specifically direct the jury to infer guilt from defendant's silence, when the court calls the jury's attention to defendant's silence as it did here, it "solemnizes" it in much the same way. Judicial comments on a defendant's refusal to testify are especially dangerous. The court is in a particular position of authority in the courtroom. It is supposed to be objective. Most importantly, the court has a duty to protect the defendant's rights. It is the court's job to take care that the jury does not infer guilt from defendant's silence. This ensures that defendants do not feel compelled to testify out of fear of such an inference. *Id.* at 614, 85 S.Ct. at 1233. Yet when the court angrily remarks to defendant "If you wanted to testify you could have taken the stand," the court not only highlights defendant's silence, but risks the jury interpreting it as expressing disapproval of defendant's failure to testify. This is surely the sort of adverse comment with which the court should be concerned. The comment implicitly encouraged the jurors to ask themselves why the defendant didn't take the stand. The problem is that the first answer likely to come to mind is that the defendant refused to testify because he is guilty. *See Lakeside*, 435 U.S. at 340 n. 10, 98 S.Ct. at 1095 n. 10. The majority recognizes that the court's comment was improper, *supra* at 989, but fails to recognize the reason why. It was improper because it risked prejudicing the defendant by making it more likely the jury would infer guilt from defendant's silence. Thus, the court's comment violated Wing's Fifth Amendment rights.

Whether there was actual prejudice such that the court's comment constitutes plain error is a tougher question. Defendant must prove the constitutional violation was so prejudicial as to change the outcome of the case. *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993). This necessarily involves assessing the weight of the evidence to determine if it was so strong that the court's comment made no difference. The risk of prejudice in this case is substantial. The court's comment not only focused the jury's attention on defendant's failure to testify, but did so in a context in which the court was critical of defendant. Moreover, the court did not correct its error with an immediate curative instruction to the jury directing it not to infer guilt from defendant's refusal to testify.[1] Finally, the court's comment came during closing arguments and thus was particularly likely to be in the jurors' minds while deliberating. The government presented a strong case, but not strong enough to convince me that the court's comment did not affect the outcome of Wing's trial. I respectfully dissent.

---

1. I agree with the majority that the court's recitation of the usual instruction to this effect along with all the other standard instructions at the end of the trial is not sufficient to cure the constitutional error. *Dortch v. O'Leary*, 863 F.2d 1337, 1344 n. 4 (7th Cir.1988).