In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2879

United States of America,

Plaintiff-Appellee,

v.

Anthony Gallagher,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois, Urbana Division.
No. 98-CR-20074--Michael P. McCuskey, Judge.

Argued April 3, 2000--Decided August 7, 2000

Before Flaum, Chief Judge, and Bauer and Williams,
Circuit Judges.

Flaum, Chief Judge.  Defendant Anthony Gallagher
was convicted of arson in violation of 18 U.S.C.
sec. 844(i). The defendant now appeals that
conviction, arguing that the district court erred
in concluding that the government presented
evidence sufficient to establish that the barn he
was accused of maliciously damaging by fire was
then being used in interstate commerce or in an
activity affecting interstate commerce. The
defendant also appeals his sentence, contending
that the district court erroneously departed
upward from the applicable Sentencing Guidelines
range based on its conclusion that the
defendant's criminal history category did not
adequately reflect the seriousness of his past
crimes. For the reasons stated herein, we affirm
both the defendant's conviction and sentence.

I.  Background

For many years, Frank and Aline Herriott owned
and operated a Welsh pony business on Green Top
Farm near Seymour, Illinois. The business enjoyed
a national reputation for producing top-quality
Welsh ponies. In the early 1980s, the Herriotts
began corresponding with the defendant in
response to his inquiries about purchasing pony
carts and other equipment. At the time, and
unknown to the Herriotts, the defendant was

serving a prison sentence for a rape conviction in Pennsylvania.

In 1986, Mr. Herriott died, and Mrs. Herriott continued to operate the Welsh pony business with the assistance of her daughter, Marjorie Plotner, and Marjorie's husband, Gene Plotner. Mrs. Herriott also continued corresponding with the defendant. In 1990, Mrs. Herriott married the defendant while he was on parole in Pennsylvania. Mrs. Herriott then arranged to have the defendant's parole transferred to Illinois so that the two could live together on Green Top Farm.

After the defendant arrived at Green Top Farm, he and Mrs. Herriott began selling her assets. In total, the couple sold approximately forty ponies, and the remainder of the herd went into decline due to a lack of care. In addition, Mrs. Herriott sold several homes that had been in the family for generations. Mrs. Plotner believed that the defendant convinced her mother to sell the homes and the ponies and was keeping the money for himself, and that the defendant was seeing another woman. When Mrs. Plotner informed her mother of these suspicions, Mrs. Herriott refused to believe her. Eventually, the relationship between Mrs. Herriott and Mrs. Plotner deteriorated to the point that the Plotners were no longer welcome at Green Top Farm.

In the fall of 1991, Mrs. Plotner called the local sheriff's office and requested that a deputy be sent to Green Top Farm to check on her mother. Mrs. Plotner testified that she requested this visit because she was concerned about her mother's well-being in light of the defendant's criminal history and the age difference between the two (approximately 40 years). Two sheriff's deputies were sent to Green Top Farm, where Mrs. Herriott informed them that she was fine and instructed them not to return.

Shortly thereafter, Mrs. Plotner received a telephone call from her mother asking Mrs. Plotner to meet her at Green Top Farm. When Mrs. Plotner arrived at the farm, her mother met her on the front steps. According to Mrs. Plotner, Mrs. Herriott stated: "If you guys don't leave me alone, you're going to get me killed." The defendant observed this conversation from a distance, and Mrs. Plotner stated that it was her belief that her mother was afraid of the defendant.

In November 1991, the defendant left Green Top Farm and moved in with Irene Duffy, the real estate agent Mrs. Herriott had employed to sell

her houses. Later that month, the defendant returned to Green Top Farm with Duffy's first cousin, Wes Becker. During this visit Mrs. Herriott gave the defendant money, but informed him that it was the last payment he would receive. According to Becker, the defendant called Mrs. Herriott an "ugly bitch" as they were driving away.

On December 2, 1991, Mrs. Plotner telephoned her mother and left a message on her answering machine. At around 3:30 p.m. that same day, the Plotners went to Green Top Farm to do some chores. They noticed that Mrs. Herriott's car was in the driveway and assumed that the defendant had taken her somewhere. At about 4:30 or 4:45 p.m., the Plotners finished their chores at Green Top Farm and returned home. Mrs. Plotner again attempted to contact her mother by telephone, but was unsuccessful.

At about 6:00 p.m. that day, the defendant telephoned the Plotners and asked if Mrs. Plotner had seen her mother. Mrs. Plotner testified that this phone call was highly unusual given the mutual dislike that existed between the Plotners and the defendant. Mrs. Plotner told the defendant that she had not seen her mother that day. Mr. and Mrs. Plotner then immediately drove to Mrs. Herriott's home.

When the Plotners arrived at Green Top Farm, they used their key to open a locked door on the east side of the house. Mrs. Plotner noticed that the alarm system had not been turned on. Mrs. Plotner also saw that immediately inside the door to the house was an antique straight-back chair perched on top of a stool. Mrs. Plotner stated that she found this unusual because her mother had once broken her shoulder and would not climb on anything in order to reach something on a high shelf. Mrs. Plotner testified that she could think of no reason why the chair would be in that position.

When they proceeded into the house, Mr. and Mrs. Plotner found Mrs. Herriott lying unconscious on the couch in the living room. Mrs. Herriott was wearing a bathrobe with nothing on underneath. Mrs. Plotner testified that she regarded this as strange because her mother usually wore her flannel nightgown and never lounged around the house in a bathrobe. Mrs. Plotner also testified that she found it unusual that Mrs. Herriott was not wearing her glasses, and that her clothes were strewn across a rocking chair in the bedroom. The paramedics were called, and Mrs. Herriott was taken to a hospital. She remained in a coma until she died on December 19, 1991.

During the period in which Mrs. Herriott was in a coma, Mrs. Plotner was appointed her temporary guardian. Mrs. Plotner also hired a private detective to investigate her mother's death. On December 10, 1991, the detective located Mrs. Herriott's glasses in the driveway of the house next to the garage. One of the lenses was found with the glasses, and the other was found approximately one hundred feet away. Becker testified that when he accompanied the defendant to Green Top Farm on December 21, 1991 to pick up some of the defendant's clothes, the defendant located the spot on the driveway where Mrs. Herriott's glasses were found and said, "This is where they found her glasses."

Before her death, Mrs. Herriott transferred most of her real property to a revocable trust. Under the terms of that trust, Green Top Farm was conveyed to Mrs. Plotner subject to a lifetime leasehold to the defendant. The defendant's leasehold was to terminate if the defendant remarried or failed to maintain the farm. Mrs. Herriott also left the defendant a half interest in her pony herd, with the remaining half going to Mrs. Plotner. The will provided that if Mrs. Plotner and the defendant could not agree on the disposition of the animals, the herd would be sold and the profits divided equally between the two.

On January 3, 1992, a complex of four barns on Green Top Farm burned down, killing five ponies and destroying approximately four thousand bales of straw. The barns were uninsured. On December 18, 1998, the defendant was charged in a one-count indictment with arson, alleging that the defendant maliciously damaged by fire the barns located at Green Top Farm.

The defendant was convicted of arson by a jury on March 26, 1999. Prior to his sentencing on that conviction, the government filed a notice of its intent to ask for an upward departure from the otherwise applicable Sentencing Guidelines range based upon its belief that this range did not adequately reflect the defendant's past criminal history. Among other things, the government sought a departure based on its contention that the defendant murdered Mrs. Herriott.

During the sentencing hearing, a forensic pathologist testified that Mrs. Herriott died from a blow to the head, and not from a fall or other accidental forces. The district court concluded from this testimony that Mrs. Herriott was murdered, and noted that the defendant had both the motive and opportunity to kill her.

After considering the evidence surrounding the alleged crime against the backdrop of the defendant's motive and opportunity, the district court determined, by a preponderance of the evidence, that the defendant murdered Mrs. Herriott. The district court then departed upward three criminal history points based on this finding, and the defendant was sentenced to 120 months in prison. The defendant now appeals.

II.  Analysis
A.  Sufficiency of the Evidence

The defendant first argues that the government failed to meet its burden of proof as to the interstate commerce element of the arson crime of which he was charged and convicted. See United States v. Zabic, 745 F.2d 464, 474 (7th Cir. 1984) (stating that the interstate commerce element of arson must be established beyond a reasonable doubt). The federal arson statute makes it illegal for an individual to "maliciously damage[ ] or destroy[ ], or attempt[ ] to damage or destroy, by means of fire . . . any building, vehicle, or other real or personal property used in interstate . . . commerce or in any activity affecting interstate . . . commerce . . . ." 18 U.S.C. sec. 844(i). According to the defendant, the evidence the government presented at trial was insufficient to establish beyond a reasonable doubt that the barns he was accused of maliciously damaging by fire were used in interstate commerce or in an activity affecting interstate commerce.

In support of his insufficiency of the evidence argument, the defendant contends that the horse business at Green Top Farm ended, and the barns were removed from interstate commerce, upon the death of Mrs. Herriott. The defendant first notes that given his lifetime leasehold interest in the farm, the defendant had the exclusive right to use the barns in question and had no intention of continuing the pony business or of using those barns in interstate commerce. The defendant also argues that the disposition of the pony herd was left to him and Mrs. Plotner and, because the two were never going to agree on the proper way of managing the ponies, the pony herd was going to be sold with the profits split between the two parties. The defendant contends that because he did not intend to use the barn in interstate commerce during the course of his leasehold, and because the pony business was going to be dissolved absent an unlikely agreement to the contrary between himself and Mrs. Plotner, Mrs Herriott's death effectively removed the barns from interstate commerce.

The defendant faces a heavy burden in

attempting to demonstrate that the government did not meet its burden of proof as to the interstate commerce element of his arson conviction. "We review questions of sufficiency of the evidence 'in the light most favorable to the government and ask whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.'" United States v. Richardson, 208 F.3d 626, 631 (7th Cir. 2000) (quoting United States v. Rogers, 89 F.3d 1326, 1334 (7th Cir. 1996)). "Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." United States v. Lundy, 809 F.2d 392, 396 (7th Cir. 1987) (quoting Brandom v. United States, 431 F.2d 1391, 1400 (7th Cir. 1970)). Moreover, in order to satisfy the interstate commerce element of 18 U.S.C. sec. 844(i), the government need only establish that the arson in question had a minimal effect on interstate commerce. See United States v. Hicks, 106 F.3d 187, 189 (7th Cir. 1997); United States v. Martin, 63 F.3d 1422, 1426 (7th Cir. 1995); United States v. Menzer, 29 F.3d 1223, 1230 (7th Cir. 1994). Because of the deferential review of sufficiency of the evidence claims and the low threshold for establishing the interstate commerce element, the defendant must demonstrate that no rational trier of fact could have found beyond a reasonable doubt that the barns the defendant was accused of maliciously damaging by fire had even a minimal effect on interstate commerce.

After a review of the record, we conclude that the government proved a sufficient nexus between the defendant's arson and interstate commerce. Although the defendant may be correct that the pony business was unlikely to continue as a viable commercial entity under the stewardship of the defendant or Mrs. Plotner, that assertion does not establish that the barns were removed from interstate commerce upon the death of Mrs. Herriott. This is not a case, as the defendant suggests, where the barns had only a past connection to interstate commerce. See, e.g., United States v. Gaydos, 108 F.3d 505 (3d Cir. 1997) (finding no connection to interstate commerce where a rental property had been removed from the rental market and where there was no intent to resume renting the property). Rather, even if we assume that the business was likely to be dissolved following Mrs. Herriott's death, the key point is that it had not been dissolved at the time the arson was committed and consequently there was no cessation of business activity. See United States v. Wing, 104 F.3d 986 (7th Cir. 1997) (finding a sufficient connection to interstate commerce where the property destroyed

received out-of-state shipments of supplies); Martin, 63 F.3d at 1427-28 (holding that the destruction of a rental property that was presently unoccupied but still available for rent satisfied the interstate commerce element of the arson statute). After the fire, much of the pony herd was sold at a public auction. In addition, at the time the defendant set fire to the barns in question, those barns sheltered breeding stallions that were also to be sold. In short, at the time the defendant set fire to the barns, those barns were still actively employed in the conduct of a pony business that was national in scope. See Jones v. United States, 120 S.Ct. 1904, 1909-10 (2000) (stating that the central inquiry under the federal arson statute is whether the damaged property is being actively employed in a commercial enterprise). In these circumstances, we cannot conclude that no rational trier of fact could have determined that the government established beyond a reasonable doubt the interstate commerce element of the defendant's arson.

B.   The Sentencing Departure

The defendant next challenges the district court's decision to depart upward from the Sentencing Guidelines range otherwise applicable to the defendant's conduct. During the defendant's sentencing hearing, the district court determined that the government proved by a preponderance of the evidence that the defendant committed past uncharged crimes, including the murder of Mrs. Herriott. The district court therefore departed upward from the applicable Sentencing Guidelines range so that the sentence would adequately reflect these past criminal activities. The defendant appeals this departure, arguing that the district court erred in finding that the government proved by a preponderance of the evidence that the defendant murdered Mrs. Herriott.

The Sentencing Guidelines permit a district court to depart upward from the otherwise applicable sentencing range "[i]f reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes . . . ." U.S.S.G. sec. 4A1.3; see also 18 U.S.C. sec. 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). In order to justify such a departure, the government must prove the alleged past criminal

conduct on which the departure is based by a preponderance of the evidence. See United States v. Klund, 37 F.3d 1249, 1252 (7th Cir. 1994). Our review of the district court's decision to depart upward is deferential, see United States v. Fonner, 920 F.2d 1330, 1332 (7th Cir. 1990) (citing United States v. Marshall, 908 F.2d 1312, 1326 (7th Cir. 1990) (en banc)), and "'we give considerable leeway to a district court's determination of the criminal history category that most accurately reflects the defendant's true criminal history.'" United States v. Brown, 999 F.2d 1150, 1153 (7th Cir. 1993) (quoting United States v. Schweihs, 971 F.2d 1302, 1319 (7th Cir. 1992)).

In this case, the district court departed upward from a criminal history category of V to a criminal history category of VI, and from an offense level of 22 to an offense level of 24, based on its conclusion that the defendant committed past uncharged crimes, including the murder of Mrs. Herriott. In concluding that the defendant murdered Mrs. Herriott, the district court first found that the defendant had both the motive and the opportunity to commit the crime. As to motive, the district court stated that the defendant had two separate reasons for murdering Mrs. Herriott: to profit financially from the disposition of Mrs. Herriott's estate and to prevent Mrs. Herriott from revealing the fraud that he perpetrated against her. In regard to opportunity, the district court found that the defendant could not account for his whereabouts during the evening of December 1, 1991 and the morning of December 2, 1991, the time during which Mrs. Herriott was allegedly attacked. In light of the defendant's multiple motives for murdering Mrs. Herriott, and in consideration of the fact that the defendant was the only suspect with the opportunity to commit the crime, the district court determined that the physical and testimonial evidence linking the defendant to the crime was sufficient to prove by a preponderance of the evidence that he committed the murder.

The physical and testimonial evidence introduced at trial regarding Mrs. Herriott's death included testimony from a forensic pathologist indicating that the cause of Mrs. Herriott's death was a blow to the head. The district court also considered evidence that the door was locked when Mrs. Plotner arrived at the house and that the alarm was turned off, and it concluded that the murder was committed by someone who, like the defendant, possessed a key to the house. The district court noted the unusual state of the house, and the appearance that someone had staged the scene to look like an accident, and found that these efforts indicated that the individual

involved wished to cover up the murder as if he expected to be a suspect. Lastly, the district court weighed the testimony of Wes Becker and found that the defendant had independent knowledge of the location at which Mrs. Herriott's glasses were found in the driveway. This evidence, combined with the defendant's motive and opportunity, was enough to convince the district court that the government proved by a preponderance of the evidence that the defendant murdered Mrs. Herriott.

In reviewing the district court's decision to depart upward, we "overturn a factual finding only if we are firmly convinced that a mistake was made." United States v. Spears, 159 F.3d 1081, 1088 (7th Cir. 1998). Because we do not find any clear error in the district court's findings of fact, we consider only whether the district court abused its discretion in finding by a preponderance of the evidence that the defendant murdered Mrs. Herriott. See United States v. Trigg, 119 F.3d 493, 502 (7th Cir. 1997) (stating that departures in the criminal history category are generally reviewed for an abuse of discretion). After a review of the factual record, we agree with the district court that reliable evidence indicates that Mrs. Herriott was murdered, and that the defendant had both clear motive and opportunity to commit the crime. Furthermore, the physical evidence indicates that the crime was committed by someone close to Mrs. Herriott, and the defendant's knowledge of the location at which the glasses were found links him to the crime. Against this factual backdrop, and in light of our deferential standard of review, we cannot conclude that the district court erred in departing upward from the otherwise applicable sentencing range based on its conclusion that the defendant's criminal history category did not adequately reflect his past crimes.

III.  Conclusion

We hold that the government introduced sufficient evidence to establish the interstate commerce element of the defendant's crime of arson and to prove by a preponderance of the evidence that the defendant murdered Mrs. Herriott. We therefore AFFIRM both the defendant's conviction and sentence.