**UNITED STATES of America, Plaintiff,**

v.

**Leong Tian KUM, Defendant.**

**No. 03–CR–141.**

United States District Court, E.D. Wisconsin.

March 8, 2004.

Richard Frohling, for Plaintiff.

Nancy Joseph, for Defendant.

### *MEMORANDUM*

ADELMAN, District Judge.

Defendant Leong Tian Kum, a Singaporean residing in Thailand, was charged in a 13 count indictment with smuggling and money laundering offenses. The indictment alleged that defendant conspired with others to illegally import protected and endangered wildlife into the United States from Thailand in order to sell it to buyers in this country. Defendant pled guilty to one count of conspiracy to smuggle wildlife into the United States contrary to 18 U.S.C. §§ 371 & 545, and one count of money laundering contrary to 18 U.S.C. § 1956(a)(2)(A). A pre-sentence report (PSR) was prepared in anticipation of sentencing, and it calculated defendant's offense level at 19 and his criminal history category at I. The parties did not dispute these calculations, but the government moved for an upward departure pursuant to U.S.S.G. § 4A1.3.

After reviewing the materials submitted and hearing the arguments of counsel, I granted the motion and departed upward from criminal history category I to category II. In this memorandum I set forth the basis for my decision.

## I. FACTS AND BACKGROUND

### A. "CITES"

The United States and Thailand are parties to the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"). *See* 27 U.S.T. 1087. CITES has been referred to as " 'the most important legal document to promote protection of wildlife to date and perhaps the only treaty which, if properly enforced, could make a significant difference in the conservation of wild flora and fauna.' " Dianne M. Kueck, *Using International Political Agreements to Protect Endangered Species: A Proposed Model,* 2 U. Chi. L. Sch. Roundtable 345, 347 (1995) (quoting Suhir K. Chopra, *Introduction: Convention on International Trade in Endangered Species of Wild Fauna and Flora,* 5 B.U. Intl. L.J. 225, 225 (1987)).

Originally joined by 21 nations in 1973, CITES now has more than 120 adherent countries. Shennie Patel, *The Convention on International Trade in Endangered Species: Enforcement and the Last Unicorn,* 18 Hous. J. Int'l L. 157, 161 (Fall 1995). The preamble to CITES sets forth its purpose and rationale:

The Contracting States,

RECOGNIZING that wild fauna and flora in their many beautiful and varied forms are an irreplaceable part of the natural systems of the earth which must be protected for this and the generations to come;

CONSCIOUS of the ever-growing value of wild fauna and flora from aesthetic, scientific, cultural, recreational and economic points of view;

RECOGNIZING that peoples and States are and should be the best protectors of their own wild fauna and flora;

RECOGNIZING, in addition, that international cooperation is essential for the protection of certain species of wild fauna and flora against over-exploitation through international trade;

CONVINCED of the urgency of taking appropriate measures to this end;

HAVE AGREED [to the following restrictions]:

*Id.* at 160; 27 U.S.T. 1087, 1973 U.S.T. LEXIS 317, at *3–4.

CITES established a permit system to place trade restrictions on three categories of threatened and endangered plant and animal species. The first category consists of species facing extinction. These species are afforded the greatest degree of protection and are listed in Appendix I to CITES ("Appendix I species"). They may be traded only in "exceptional circumstances" and may never be traded for "primarily commercial purposes." Kueck, *supra*, at 347. The second category consists of the species listed in Appendix II to CITES ("Appendix II species"), which are not immediately threatened with extinction but which may become threatened unless trade is restricted. *Id.* Commercial trade in such species is allowed only if proper permits are issued. "The third category consists of species that the parties to CITES stipulate are subject to regulation in their jurisdiction but whose protection requires the cooperation of outside nations ('Appendix III species')." *Id.*

CITES is administered and enforced primarily by the member nations, in coordination with the CITES Secretariat. *Id.* at 348. In the United States, CITES is administered by the Fish and Wildlife Service (FWS). To import an Appendix I species into the United States, a party must obtain a "foreign export permit" issued by the specimen's country of origin and an "import permit" issued by the FWS. To import an Appendix II species, a party must obtain a "foreign export permit" issued by the country of origin or a "foreign re-export certificate" issued by the country of re-export.[1]

## B. Defendant's Conduct Contrary to CITES

Defendant worked with associates in Singapore and Thailand to acquire protected wildlife, including Appendix I species (the radiated tortoise) and Appendix II species (the Indian star tortoise, Hermann's tortoise, Burmese star tortoise, Pancake tortoise, Emerald tree monitor, Elongated tortoise, Borneo black leaf turtle, and slow loris—a primate). Using various aliases, defendant then contacted buyers in Europe and the United States, offering to ship wildlife for the illegal pet trade.

In order to avoid detection and obviate the need for CITES permitting, defendant concealed the wildlife in Federal Express packages which purported to contains arts, crafts, and clothes, etc. To minimize the risk of detection due to noise or movement, he sometimes bound the animals' mouths and limbs with tape or bandages. He also explored how long certain animals could survive without food or water. Many of the specimens died en route to their destinations.

Typically, the recipients of those specimens that survived would offer them for re-sale. One recipient, who used the alias "John Thompson," became a cooperating witness for the government. Thompson came to the attention of authorities when a customs inspector at the Federal Express hub in Anchorage, Alaska noticed a suspi-

---

1. The Endangered Species Act, 16 U.S.C. § 1538, also implements CITES by prohibiting trade in any specimen contrary to the Convention. The Lacey Act, 16 U.S.C. § 3372, also makes it unlawful for any person to "import, export, transport, sell, receive, acquire, or purchase any fish or wildlife or plant taken, possessed, transported, or sold in violation of any ... treaty." *See also United* *States v. Bernal,* 90 F.3d 465, 467 (11th Cir. 1996) ("The purpose of the Lacey Act is to protect those species of fish and wildlife whose continued existence is presently threatened by gradually drying up the international market for endangered species, thus reducing the poaching of any such species in the country where it is found.") (internal quote marks omitted).

cious package being sent from defendant in Thailand to Thompson in Waukesha, Wisconsin. The inspector x-rayed the package and discovered that it contained 10 Indian star tortoises and an Emerald tree monitor.

After obtaining a search warrant, agents made a controlled delivery of the package to Thompson. Thompson agreed to cooperate with authorities and turned over his e-mails with an individual identifying himself as "Bobby Lee," an alias used by defendant. The e-mails revealed that defendant had contacted Thompson and offered to sell various species at low prices, which he could offer because he shipped without CITES permits. Over the next few months, the FWS worked with Thompson to arrange two controlled buys from defendant. Agents learned that defendant was illegally shipping wildlife to another Waukesha area individual, Reid Turowski, who was later charged in the same indictment as defendant.

In June 2003, agents learned that defendant planned to travel to the United States to facilitate further smuggling. On June 28, 2003, defendant arrived in Florida and met with Thompson and two undercover agents. During a subsequent meeting, which was taped, defendant described his smuggling practices and expressed his desire to ship large quantities to the United States. After the meeting, he was arrested. At the time, he was in possession of photos of dozens of protected tortoises, as well as false identification cards.

Defendant's e-mails revealed that he was involved in smuggling "girls" as well as wildlife. They also described bribes paid by defendant to Thai officials to facilitate smuggling, as well as cruel treatment by defendant of animals he shipped. The government argued that these e-mails provided a basis for an upward departure from the applicable sentencing range.

## II. DEPARTURE STANDARD

The court may depart from the applicable guideline range if it finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. 18 U.S.C. § 3553(b)(1). The Commission has provided guidance in making departure decisions by listing certain factors that are "forbidden" bases for departure, "encouraged" bases for departure, and "discouraged" bases for departure. A court confronted with a motion for a departure should first determine what factors make the case unusual, taking it out of the "heartland" of typical cases, and then whether the Commission has forbidden, encouraged, or discouraged departures based on those factors. *Koon v. United States*, 518 U.S. 81, 93–95, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

> If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. If a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guideline's heartland.

*Id.* at 95–96, 116 S.Ct. 2035 (internal citations omitted).

In the present case, the government relied on U.S.S.G. § 4A1.3, which provides an "encouraged" basis for departure. *See United States v. Hammond,* 240 F.Supp.2d 872, 876 (E.D.Wis.2003). Section 4A1.3(a)(1) states: "If reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure may be warranted." Information justifying a departure under § 4A1.3 may include:

. (A) Prior sentence(s) not used in computing the criminal history category (e.g., sentences for foreign and tribal offenses).

(B) Prior sentence(s) of substantially more than one year imposed as a result of independent crimes committed on different occasions.

(C) Prior similar misconduct established by a civil adjudication or by a failure to comply with an administrative order.

(D) Whether the defendant was pending trial or sentencing on another charge at the time of the instant offense.

(E) Prior similar adult criminal conduct not resulting in a criminal conviction.

U.S.S.G. § 4A1.3(a)(2).

## III. DISCUSSION

### A. Whether to Depart

The government relied on three alleged instances of "similar adult criminal conduct" that did not result in conviction to justify a § 4A1.3 departure. First, it alleged that defendant's e-mails to someone called "William," who used the screen name "p21p21," and a convicted smuggler named Lawrence Wee Soon Chye, a/k/a Jon Morelia, showed that defendant was involved in a conspiracy to smuggle girls from Thailand to Singapore for purposes of prostitution. Second, the government claimed that the e-mails between defendant and William showed that in the course of smuggling dogs and cats defendant engaged in acts of cruelty, including taping their mouths. Third, the government argued that the e-mails referenced bribes defendant paid to Federal Express employees and Thai officials. The government asserted that this information was reliable, and that if defendant had been convicted of these or equivalent offenses his criminal history category could have been raised from I to IV.

Defendant opposed the motion. He argued that the information presented by the government was insufficiently reliable to support an upward departure. First, he contended that there was no evidence of a substantial step toward, or an overt act in furtherance of, the alleged prostitution scheme. Second, he argued that the e-mail medium lends itself more easily to puffery than other modes of communication. Third, he argued that even if the e-mails included admissions of illegal conduct some corroboration was required. Finally, he argued that if the court concluded that an upward departure was appropriate, three categories was too many.[2]

---

2. Defendant also submitted a sentencing memorandum requesting that the court sentence him within the guideline range because his status as a deportable alien would adversely affect his conditions of confinement. Defendant pointed out that he had experienced unusual difficulties during his pre-trial incarceration due to his lack of acclimation to the United States. He also argued that the loss amount was inflated somewhat by the controlled buys the government made. For these reasons he contended that a sentence within the guideline range was sufficient to satisfy the purposes of sentencing under 18 U.S.C. § 3553(a).

■ Upon reviewing the evidence presented by the government, and considering defendant's counter-arguments, I concluded that reliable information indicated that defendant's criminal history category substantially under-represented the seriousness of his criminal history. In reaching this conclusion, I focused on the evidence of human trafficking for purposes of prostitution. While the government had presented evidence of possible bribes and cruel (or at least recklessly indifferent) treatment of animals that defendant had smuggled, and while I was authorized to depart based on reliable information of this sort, I concluded that in the present case this alleged conduct was best viewed as essentially part and parcel of the offenses of conviction and was appropriately considered in setting the sentence within the guideline range.[3] I also noted that had it been possible to charge these offenses in the present indictment, they likely would have been subsumed within the presently applicable guideline range, or had they resulted in independent convictions they may have been subject to U.S.S.G. § 4A1.2(a)(1) because they involved conduct that was "part of" the instant offense.[4] I therefore declined to exercise my discretion under § 4A1.3 to depart on these two bases.

■ The evidence of human trafficking came from an e-mail account defendant admitted he used. The evidence upon which I based the departure was as follows:

In October 2002, defendant communicated with Chye about getting girls to go abroad to make money. On October 14 and 15, defendant, then a resident of Thailand, began making plans with William, who was in Singapore, to smuggle girls into Singapore for prostitution. They discussed how they would transport the girls, and who would pay the fares. William offered to pay defendant between 600 and 1000 dollars depending on the girl's photo. On November 21, William suggested that transporting the girls be delayed because the police had recently arrested a lot of girls in the Geylang area of Singapore. William wrote that he did not feel that it was safe at the time. William also asked that defendant send the girls' photos first.

On February 6, 2003, defendant, using the alias "Anthony," wrote William that he had about five girls "ready to go." William asked a number of questions: when were the girls coming, did defendant have photos, were they were coming by bus or air, had they been to Singapore before, how he could contact them, what was the

---

3. At sentencing, the government displayed photographs of taped and bound animals defendant shipped. For instance, defendant taped tortoises' legs and heads inside their shells to prevent them from moving. (Govt. Ex. 3 at 20–24.) One photograph depicts what appears to be dried blood ostensibly from self-inflicted injuries caused by a tortoise's attempt to free itself. (Id. at 24.) The government's motion was based on § 4A1.3 and, in effect, sought to elevate defendant's criminal history category as if he had been convicted of three additional offenses as referenced in defendant's e-mails. I elected, in the exercise of discretion, to consider the evidence of cruelty within the guideline range. However, I note that the cruelty depicted in the photographs, coupled with the evidence

that many of the animals defendant shipped did not survive, may well have supported an offense level enhancement under § 5K2.0. Cf. U.S.S.G. § 5K2.2 (allowing upward departure for significant physical injury); § 5K2.3 (allowing upward departure for extreme psychological injury); § 5K2.8 (allowing upward departure for conduct that "was unusually heinous, cruel, brutal, or degrading to the victim"). Defendant's treatment of many of these endangered animals was simply reprehensible.

4. Under § 4A1.1, the court assigns criminal history points based on the length of any "prior sentence." Section 4A1.2(a)(1) excludes prior sentences for conduct that was "part of the instant offense."

price, who should he give the money to, and what if the girls ran away?

On February 7, defendant responded with the answers. He said that there would be five girls ready to go anytime. He stated that he would "implant fear in them" by asking them for their photos and ID cards, and by telling them that someone would go to their hometown to check if that was their real address. "So they won't dare run away." Defendant stated that one of the girls had visited Singapore before, and that, as for money, he would send photos first so that William could tell him if the girls were worth more. He stated that he would see the five girls that night. He confirmed that each girl had to do 80 tricks with no share, but would get $10 per day plus a place to sleep. There was also to be a "guard."

On February 11, the two communicated again. Defendant stated that the girl who had previously been to Singapore had put on too much weight and was more useful to him as a recruiter. He stated that he was collecting the photos the next night. William told defendant to instruct the girls that if they were stopped by the police they should say, "NO BOSS ME COME HERE MYSELF."

On February 13, defendant wrote to William stating that he would ask the girls for sexy looking photos, and that he would tell them to dress to kill when he met them with a digital camera. William advised that it would be cheaper if the girls came by bus than by air. He also asked for a full size photo with the girls in sexy clothes that "can kill all guys."

U.S.S.G. § 6A1.3 provides that at sentencing "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." In the commentary, the Commission notes that the court may rely on uncharged conduct. Further, reliable hearsay may be considered. The evidence disclosed in the e-mails between defendant and William satisfies the above criteria of reliability. The government established by a preponderance of the evidence that defendant participated in these communications. Defendant admitted using the e-mail account and did not challenge the PSR's statement that he used the alias "Anthony." The e-mails contained detailed plans to smuggle girls. It was undisputed that William's e-mails originated in Singapore. Finally, the government presented evidence that human smuggling for purposes of the sex trade is a problem in Thailand and Singapore.

Defendant's counter-arguments were not persuasive. He first argued that mere bad intentions were insufficient to sustain a conviction in a conspiracy or attempt case; rather, some serious step toward accomplishing the offense must take place. However, the burden of proof applicable at trial is inapplicable at sentencing. In order to justify a departure, the government need only prove by a preponderance of reliable evidence that defendant engaged in the conduct at issue. *See United States v. Gallagher*, 223 F.3d 511, 516 (7th Cir. 2000). Further, the evidence showed that defendant did take steps toward commission of the offense. He had five girls "ready to go," had discussed price and transport, and had reached agreement on the girls' share. Although the evidence did not establish a completed offense, it did demonstrate a conspiracy or attempt to smuggle girls for purposes of prostitution.

Second, defendant argued that the e-mails may have been puffery. However, his conversations went beyond mere puffery to actual planning.

Third, defendant argued that even if the e-mails could be considered confessions

they lacked corroboration. But at sentencing, corroboration is not required. *See United States v. McEntire*, 153 F.3d 424, 436 (7th Cir.1998) (stating that district court is entitled to credit testimony that is totally uncorroborated, so long as there is sufficient indicia of reliability).

Ultimately, I concluded that the e-mail evidence was sufficiently reliable to show that defendant conspired to smuggle women for purposes of prostitution. Defendant presented no contrary evidence. Therefore, a departure was appropriate. *See United States v. Carter*, 111 F.3d 509, 514 (7th Cir.1997) (affirming upward departure based on evidence of defendant's past, uncharged criminal conduct, including violence to prostitutes he pimped); *see also United States v. Delmarle*, 99 F.3d 80, 85–86 (2d Cir.1996) (affirming upward departure based on foreign criminal conduct, even though foreign conviction was constitutionally infirm, because investigative records were sufficiently reliable).

I acknowledged the arguments presented in defendant's sentencing memorandum. He noted several factors that may in some cases support a downward departure: his deportable alien status,[5] lack of acclimation to the United States—and the effect of such factors on his past and future confinement—and the fact that the loss amount was inflated by the controlled buys. Notwithstanding these factors, I believed that the government had shown by a preponderance of the evidence that an upward departure under § 4A1.3 was appropriate. Defendant is fluent in English, so he will be able to communicate in an American prison. I also could not conclude that the fact that the government made controlled buys from defendant re-

sulted in an unfair increase in the loss amount and thus his offense level. The factors that defendant mentioned may be considered—both in setting the sentence and departing—but in the present case I believed it appropriate to exercise my discretion and depart upward.[6]

**B. Extent of Departure**

■ Once the court determines that a departure is appropriate, it must determine the extent of departure. Section 4A1.3 says that "the court shall determine the extent of a departure under this subsection by using, as a reference, the criminal history category applicable to defendants whose criminal history or likelihood to recidivate most closely resembles that of the defendant's." U.S.S.G. § 4A1.3(a)(4)(A). The Seventh Circuit has held that in exercising the departure

> power the district judge may not simply pitch out the guidelines but must abide by their structure—principally by asking what the effect on the sentencing level would have been if the defendant had been charged with, and convicted of, the other criminal conduct that the judge finds has occurred. In particular, ... a judge may not depart by more than would have been appropriate in the event of a conviction. Uncharged conduct may be serious, and a district judge may take it into account, but criminal acts (determined on the basis of a preponderance of "reliable" evidence) that have not led to a conviction cannot justify a greater enhancement than identical conduct that has led to a conviction on proof beyond a reasonable doubt.

---

5. *But see United States v. Meza–Urtado*, 351 F.3d 301 (7th Cir.2003) (holding that departure based on deportable alien status was prohibited).

6. Any mitigating information defendant presented was far outweighed by the reprehensibility of his conduct both with respect to the girls he intended to smuggle and the animals he did smuggle.

*United States v. Rogers,* 270 F.3d 1076, 1082 (7th Cir.2001) (internal citations omitted).

In the present case, I agreed with defense counsel's calculations as to where defendant would be placed on the grid had he been convicted of the prostitution offense. Characterizing this conduct as an attempt or conspiracy to commit an offense under 18 U.S.C. § 1591—sex trafficking by force, fraud or coercion—the applicable guidelines would be § § 2G1.1 and 2X1.1. The base offense level would be 14 rather than 19 under § 2G1.1(a) because there is no reliable evidence that the offense involved minors. Defendant used the term "girls" to describe the prostitutes, but I could not find by a preponderance of the evidence that this necessarily meant females under the age of 18. Four levels would be added for the use of force, fraud or coercion under § 2G1.1(b)(1), and three levels would be subtracted under § 2X1.1 because the evidence showed only an attempt or conspiracy. Giving defendant the benefit of the doubt, I subtracted two levels for acceptance of responsibility under § 3E1.1, for a total level of 13. In criminal history category I, this would produce a range of 12–18 months.[7] Thus, this offense would add two or three points to defendant's criminal history score and place him in category II. *See* U.S.S.G. § 4A1.1(a) & (b). I therefore upwardly departed to category II.

Defendant noted that we do not know what the sentence would have been had defendant been convicted in Singapore or Thailand, where the conduct occurred. Under § 4A1.2(h), foreign sentences do not count towards criminal history but may be considered under § 4A1.3. It

seems reasonable, when considering the effect of foreign criminal conduct, to translate such conduct into guideline terms and thereby tie the departure to the structure of the guidelines. *See United States v. Fordham,* 187 F.3d 344, 348 (3d Cir.1999) (affirming § 4A1.3 upward departure and noting what sentence for foreign conduct would have been under United States sentencing guidelines); *see also United States v. Mundo,* No. 99–4888, 2000 WL 799385, at *1, 2000 U.S.App. LEXIS 14451, at *4 (4th Cir. June 22, 2000) (affirming upward departure under § 4A1.3 and noting that a conviction for the underlying, foreign conduct would have exposed the defendant to a sentence of up to five years imprisonment in the United States); *United States v. Spencer,* No. 94–10266, 1995 WL 40320, at *3, 1995 U.S.App. LEXIS 2697, at *9–10 (9th Cir. Feb. 1, 1995) (affirming upward departure to criminal history category defendant would have been in if he had been convicted of foreign crimes in the United States); *cf. United States v. Korno,* 986 F.2d 166, 168 (7th Cir.1993) (rejecting defendant's contention that district court erred "by mechanically treating his Canadian convictions as the equivalent of domestic convictions and merely plugging the foreign convictions into the criminal history calculations," where court departed under § 4A1.3).

### III. CONCLUSION

With an offense level of 19 and criminal history category of II following departure, the imprisonment range was 33–41 months. Given the evidence of cruel and reckless treatment of the animals defendant smuggled, as well as the need to further the purposes of CITES, a sentence

---

**7.** I noted that § 2G1.1(d)(1) provides that if there was more than one victim, chapter 3, part D should be applied as if each victim were a separate count. Assuming five victims, this could add five levels under § 3D1.4, and increase the range. Ultimately, because an addition of two or three criminal history points would leave defendant in the same category, the effect of § 2G1.1(d)(1) was academic.

at the upper end of the range was called for. I therefore sentenced defendant to 41 months in prison. Other conditions of the sentence appear in the judgment.